# EXHIBIT H

Westlaw.

Page 1

40 C.P.R. (2d) 164, 89 D.L.R. (3d) 195, 22 N.R. 161

1978 CarswellNat 164

Mentmore Manufacturing Co. v. National Merchandise Manufacturing Co.

Mentmore Manufacturing Co., Limited and Rotary Pen Corp., Appellants, (Plaintiffs) v. National Merchandise Manufacturing Co. Inc. and Morton Goldenberg, Respondents, (Defendants)

Federal Court, Appeal Division

Urie, J., Ryan, J., Le Dain, J.

Judgment: June 30, 1978
Docket: Doc. A-214-74

Copyright © CARSWELL

a Division of Thomson Canada Ltd. or its Licensors. All rights reserved

Counsel: Malcolm E. McLeod, Esq., Robert Brouillette, Esq., for the Appellants.

G. Alexander Macklin, Esq., for the Respondents.

Subject: Intellectual Property; Property; Civil Practice and Procedure

Patents --- Actions for infringement -- When infringement arises -- Persons liable

Corporations -- Principal shareholder land director not liable unless deliberate, wilful and knowing pursuit of course of conduct that was likely to constitute infringement or reflected on indifference to the risk of it.

Officers of company -- Personal liability of president of company infringing patent -- Applicable test -- Whether officer "deliberately or recklessly embarking on a scheme, using the company as a vehicle, to secure profit or custom which rightfully belonged to the plaintiffs".

Patents --- Actions for infringement -- When infringement arises -- Persons liable

Corporations -- Principal shareholder land director not liable unless deliberate, wilful and knowing pursuit of course of conduct that was likely to constitute infringement or reflected on indifference to the risk of it.

Officers of company -- Personal liability of president of company infringing patent -- Applicable test -- Whether officer "deliberately or recklessly embarking on a scheme, using the company as a vehicle, to secure profit or custom which rightfully belonged to the plaintiffs".

Patents --- Actions for infringement -- When infringement arises -- Persons liable

40 C.P.R. (2d) 164, 89 D.L.R. (3d) 195, 22 N.R. 161

Corporations -- Principal shareholder land director not liable unless deliberate, wilful and knowing pursuit of course of conduct that was likely to constitute infringement or reflected on indifference to the risk of it.

Officers of company -- Personal liability of president of company infringing patent -- Applicable test -- Whether officer "deliberately or recklessly embarking on a scheme, using the company as a vehicle, to secure profit or custom which rightfully belonged to the plaintiffs".

Patents --- Actions for infringement -- When infringement arises -- Persons liable

Corporations -- Principal shareholder land director not liable unless deliberate, wilful and knowing pursuit of course of conduct that was likely to constitute infringement or reflected on indifference to the risk of it.

Officers of company -- Personal liability of president of company infringing patent -- Applicable test -- Whether officer "deliberately or recklessly embarking on a scheme, using the company as a vehicle, to secure profit or custom which rightfully belonged to the plaintiffs".

Le Dain, J. reasons for judgment:

1   This is an appeal from a judgment of the Trial Division dismissing an action for patent infringement.

2   The appellants succeeded in their action for infringement against the respondent National Merchandise Manufacturing Co. Inc. (hereinafter referred to as "National") and there was no appeal from that judgment. National was found to have infringed Claim 1 of Canadian Letters Patent No. 554,988, owned by the appellant Mentmore Manufacturing Co., Limited (hereinafter referred to as "Mentmore") and under which the appellant Rotary Pen Corp. (hereinafter referred to as "Rotary" held an exclusive licence. The action against the respondent Morton Goldenberg, who, as a principal shareholder and President of National was alleged to have directed the infringement, was dismissed. The appeal is from that judgment.

3   The patent was issued on March 25th, 1958 for an invention entitled "Writing Instruments Having a Retractable Writing Point". The subject matter of the patent is described in the judgment of the Trial Division as follows:

> The subject matter is a retractable pen of the ball point type where, by depressing a push member or press button at the end opposite to the writing point or ball point, the writing point is extended to a fixed protracted position out of the main casing or barrel. In that position, the user of the pen is able to write with it, and the writing point remains in the extended position as long as required. When the pen is not required for writing purposes, a second depression of the push button or push member retracts the writing point into the casing of the pen. The operation and mechanism by which the protracted and retracted positions are arrived at are the essential parts of the invention claimed.

4   It will be convenient hereafter to refer to this kind of pen as a "retractable pen". Two "lines" or types of such pen were referred to in the evidence and the judgment of the Trial Division: the "intermediate" type pens, and the "slim line" pens.

5   The issue on appeal is whether the respondent Goldenberg, because of the nature of his involvement in the manufacture and sale of the retractable pens that were found by the Trial Division to have infringed the Mentmore patent, should be held personally liable for the infringement. It is necessary then to consider the facts of that involvement.

Copr. © West 2007 No Claim to Orig. Govt. Works

40 C.P.R. (2d) 164, 89 D.L.R. (3d) 195, 22 N.R. 161

6    National was incorporated in 1949 and carried on business in the province of Quebec. The shares of the company were held 50% by Goldenberg and 50% by his brother-in-law, Sidney Berkowitz. As indicated above, Goldenberg was the President of the Company. While it was alleged that he was a director of the company the evidence does not clearly show that he was, although it is likely that he was. In any event, in view of the fact that, with Berkowitz, he clearly controlled the company and directed its operations, I do not think the question whether or not he was a director is important in so far as liability is concerned. It is what he actually did that matters. It would appear that Goldenberg and Berkowitz were in effect partners and that they took all important decisions jointly.

7    National was a small company with some 20 employees. It occupied the second and third floors of a three-storey building. The second floor was used for storage and the third floor for the assembly of parts into pens. On the first floor parts were manufactured by a firm called Pronto Precision. The parts so produced were delivered to National on the second and third floors by conveyor belt. The evidence shows that there was some relationship between Pronto Precision and Goldenberg and Berkowitz, but the precise nature of the relationship is not clear. It would appear to have been controlled in some way by them. Werner Krische, a tool maker who worked for Pronto from 1960 to 1965, testified that Goldenberg and Berkowitz, who had their offices on the third floor, were his "bosses". From time to time they would visit the first floor to look things over. They gave directions to him concerning the manufacture of parts.

8    National was assembling and selling retractable pens for some time before the issue of the Mentmore patent and before it began to do business with Rotary. It obtained parts for the pens from various sources, including a firm called Blaines Plastics. In May, 1958, National obtained a mold from Blaines Plastics with which it made parts that were assembled into pens sold by it. The Mentmore patent was issued in March, 1958, and in the fall of 1958 Rotary began making parts for retractable pens and began selling parts to National. In November, 1959, National ordered molds with which to make parts for an intermediate pen from A.H. Austin in England and a mold to make the barrels for such pens from Adolfe Rostan in Italy. Goldenberg took parts that had been made on the Blaines' molds to Austin to show what was wanted. From about the middle of 1959 National began purchasing parts for a slim-line pen from a company called "Tilco" and later obtained molds from "Tilco" with which to manufacture such parts. From about the beginning of 1960 National was producing its own parts through Pronto on molds it had obtained from various sources. The molds from Austin and Rostan were received late in 1960.

9    A letter dated March 10, 1960 was written by Rotary to National as follows:

>  National Mdse. Mfg. Company
>
>  180 Bates Road
>
>  Montreal 8, Que.
>
>  Attention: Mr. Morton Goldenberg
>
>  Dear Mort:
>
>  We wish to call to your attention that we hold the patent rights to Canadian patent #554,988 issued to William F. Johnson, dated March 25, 1958. This patent covers writing instruments and/or parts of the so-called "ratchet mechanism" type. Sale of those pens and/or parts that are not of our manufacture constitutes deliberate infringement of this patent for which appropriate action will be taken.
>
>  All questions regarding license for same should be addressed to us.
>
>  Very truly yours,

Copr. © West 2007 No Claim to Orig. Govt. Works

40 C.P.R. (2d) 164, 89 D.L.R. (3d) 195, 22 N.R. 161

ROTARY PEN CORP.

Albert Shea

10   From 1960 to 1962 National bought parts from Rotary but also continued to manufacture its own parts. Warren Shea, President of Rotary, testified that in 1960 he spoke to Goldenberg and Berkowitz about the existence of a slim-line pen that was not of Rotary's manufacture and received the "casual assurance that they were going to cease the manufacture of it". There was a meeting in the fall of 1962 between the representatives of National and Rotary concerning the slim-line pen. National agreed to stop producing the "Mentmore" slim-line, and Rotary agreed to permit National to dispose of its existing inventory of slim-line pens. There is some uncertainty as to precisely what was understood by the "Mentmore" slim-line, but it is contended that it could be reasonably inferred from this meeting and agreement that the question of patent infringement had been resolved. After 1962 Rotary's sales of intermediate pen parts to National decreased. On October 12, 1964 Rotary wrote to National as follows:

> On March 10, 1960, we notified you that we hold the patent rights to Canadian Patent #554,988, which covers writing instruments and/or parts of the so-called "ratchet mechanism" type. Subsequently this matter was discussed with you on the telephone, and on visits to your office by Mr. Warren Shea. During one of these visits, in the fall of 1962, this matter was discussed in some detail and when apprised of our license terms, you indicated that the quantity of slim parts and pens you had been making was insufficient to warrant your continuance.
>
> Subsequently, instead of phasing out your manufacturing of the slim pen and parts, you enlarged your infringement by extending your manufacture into other sizes.
>
> You are hereby notified to cease and desist from further infringement of this patent, also to arrange with us for an accounting of past infringement. A prompt reply, indicating your intentions in this matter, is requested.

11   In October 1964 Berkowitz set up International Pen Co. Ltd. There was some change in the proportion of shares held by Goldenberg and Berkowitz in National, but Berkowitz remained a shareholder. Decisions with respect to National continued to be taken jointly by Goldenberg and Berkowitz.

12   An action for infringement was instituted by Rotary against National in December, 1965. In March, 1966, International Pen Co. Ltd. entered into a licence agreement with Rotary. An action for infringement was instituted by Rotary against Goldenberg in August, 1966. The two actions were joined and Mentmore was added as a plaintiff. The "Amended Statement of Claim Including Particulars of Breaches", as amended November 26, 1970, contains the following allegation with respect to Goldenberg in paragraph 12:

> 12. Defendant Goldenberg expressly directed, ordered, authorized, aided and abetted Defendant National to perform the acts complained of in paragraphs 10 and 10(a) above, participated therein and was a party thereto.

13   Paragraphs 10 and 10(a) set out the alleged acts of infringement by National.

14   At trial the defendants admitted to having manufactured and sold intermediate pens (of the kinds that were eventually found by the trial Judge to have constituted infringement) through the period from September 1st, 1964 to December 10, 1965, and slim-line pens (of the kinds that were eventually found by the trial Judge to have constituted infringement) from September 1st, 1964 to April 1970. These then are the periods of infringement in relation to which the acts of Goldenberg relied on by the appellants have to be considered.

Copr. © West 2007 No Claim to Orig. Govt. Works

40 C.P.R. (2d) 164, 89 D.L.R. (3d) 195, 22 N.R. 161

15   In paragraph 10 of the Amended Statement of Claim the appellants alleged that the respondents had molds made by copying the parts manufactured and sold by Rotary as follows:

> 10. Without the license or consent of Plaintiffs the Defendant National had molds made from the barrel top and bottom parts, plungers and ratchets originating from Plaintiff Rotary and used and threatens to continue to use the same or similar molds in commercial production of barrel top and bottom parts, plungers and ratchets which it used and threatens to continue to use to assemble and make writing instruments as described in paragraph 8 above....

16   On this issue the learned trial Judge made the following finding:

> ...the plaintiffs contended I should draw an inference that the molds obtained by National were made by copying the essential Rotary parts, the barrel, the rotatable member, and the push member. In my view, the evidence on this aspect of the matter is not strong enough for me to draw such an inference.

17   The trial Judge found that "Goldenberg and Berkowitz imparted the practical, business, financial and administrative policies and directives which ultimately resulted in the assembling and selling of some goods (in National's over-all stock of goods) which I have found infringed the plaintiff's rights", but that this was not enough to make Goldenberg personally liable for the infringement. He expressed the test to be applied in the following passage from his reasons for judgment:

> In my opinion, there must be some evidence of intention (or evidence from which a reasonable inference can be drawn) that Goldenberg (or Goldenberg and Berkowitz jointly) deliberately or recklessly embarked on a scheme, using the company as a vehicle, to secure profit or custom which rightfully belonged to the plaintiffs. I add that I make a distinction between the intention I have referred to in dealing with the liability of a person as a director and the overall matter of intention in respect to infringement generally. The latter aspect is dealt with in Fox *(supra)* at p. 381:
>
> > ...The intention of an infringer is immaterial. Infringement is committed as much in ignorance as with actual intent. Everyone is presumed to have notice of a patent and, therefore, a patent may be infringed by one who is ignorant of its existence. As stated in *Stead v. Anderson*, the question of infringement depends not upon what the defendant intends, but upon what he does. Thus, in *Young v. Rosenthal*, Grove J. said: "Intention is not a part of infringement. A man may infringe a patent although he does not know how he has infringed it, as a patentee may claim as a novelty that which is not a novelty. But then, if it is not a novelty, he must suffer, whether he intentionally infringes or whether he does not intentionally infringe."

18   The trial Judge concluded that the evidence was insufficient to warrant the inference that Goldenberg "deliberately or recklessly embarked on a scheme, using the company as a vehicle, to secure profit or custom which rightfully belonged to the plaintiffs".

19   The appellants contend that the trial Judge erred in law in applying the test he did, but that if the test be correct he was clearly wrong in finding that the evidence did not support such an inference.

20   The respective contentions of the parties as to the applicable principle of law are reflected in the following passages from their memoranda of fact and law:

> Appellants submit that the authorities stand for the proposition that, in order to be personally liable for patent infringement by a company, it is not required that a director or officer have an intention to infringe,

Copr. © West 2007 No Claim to Orig. Govt. Works

40 C.P.R. (2d) 164, 89 D.L.R. (3d) 195, 22 N.R. 161

> or that the director or officer deliberately or recklessly embark on a scheme, using a company as a vehicle to secure profit or custom which rightly belongs to the plaintiff, but only (1) that the directors or officers have directly ordered or authorized the acts complained of or so ordered or authorized by implication and (2) that these acts complained of constitute infringement. Any intention which may be required is not intention to infringe but is inherent in directing or authorizing the performance of acts (either expressly or by implication) which the court find subsequently to be infringing acts. (Appellant's Memorandum of Fact and Law, para. 43).

. . . . .

> It is submitted that where a corporation was not incorporated for a wrongful purpose, the directors of that corporation will not be personally liable for the tort of the corporation unless it is shown that the directors, having control of the corporation, expressly direct the corporation to commit a wrongful thing to be done knowing it to be wrong. (Respondent's Memorandum of Fact and Law, para. 74).

21    The learned trial Judge referred to the applicable law as follows:

> The law in respect of the liability of directors or officers for tortious acts committed by the company is, to my mind, best stated by Atkin L.J. in *Performing Right Society v. Ciryl Theatrical Syndicate* (1924) 1 K.B. 1 at pp. 14-15:
>
>> Prima facie a managing director is not liable for tortious acts done by servants of the company unless he himself is privy to the acts, that is to say unless he ordered or procured the acts to be done. That is authoritatively stated in *Rainham Chemical Works v. Belvedere Guano Co.*,[FN1] where it was sought to make a company liable for an explosion upon their works in the course of manufacturing high explosives. The company were held liable on the principle of *Rylands v. Fletcher*. It was also sought to charge two directors with liability. They were eventually held responsible because they were in fact occupiers of the works. It was contended that they were liable on the ground that they were managing directors of the company, that the company was under their sole control as governing directors, and that they were responsible for the work done by their servants. Lord Buckmaster said: "I cannot accept either of these views. If the company was really trading independently on its own account, the fact that it was directed by Messrs. Feldman and Partridge would not render them responsible for its tortious acts unless, indeed, they were acts expressly directed by them. If a company is formed for the express purpose of doing a wrongful act or if, when formed, those in control expressly direct that a wrongful thing be done, the individuals as well as the company are responsible for the consequences, but there is no evidence in the present case to establish liability under either of these heads." Perhaps that is put a little more narrowly than it would have been if it had been intended as a general pronouncement without reference to the particular case; because I conceive that express direction is not necessary. If the directors themselves directed or procured the commission of the act they would be liable in whatever sense they did so, whether expressly or impliedly.

22    The appellants relied particularly on the following statement of the law in Halsbury's Laws of England, 3rd ed., vol. 29 ("Patents and Inventions"), para. 192, p.90, which, while it does not expressly refer in the notes to what was said by Lord Atkin in the *Performing Right Society* case, would appear to be based upon it:

> 192. *Liability of directors for infringement*. The directors of a company are not personally liable for infringements by the company, even if they are managing directors or the sole directors and shareholders, unless either (1) they have formed the company for the purpose of infringing; or (2) they have directly ordered or authorised the acts complained of; or (3) they have so authorised or ordered by implication.

Copr. © West 2007 No Claim to Orig. Govt. Works

40 C.P.R. (2d) 164, 89 D.L.R. (3d) 195, 22 N.R. 161

23   What is involved here is a very difficult question of policy. On the one hand, there is the principle that an incorporated company is separate and distinct in law from its shareholders, directors and officers, and it is in the interests of the commercial purposes served by incorporated enterprise that they should as a general rule enjoy the benefit of the limited liability afforded by incorporation. On the other hand, there is the principle that everyone should answer for his tortious acts. The balancing of these two considerations in the field of patent infringement is particularly difficult. This arises from the fact that the acts of manufacture and sale which are ultimately held by a court to constitute infringement are the general business activity of a corporation which its directors and officers may be presumed to have authorised or directed, at least in a general way. Questions of validity and infringement are often fraught with considerable uncertainty requiring long and expensive trials to resolve. It would render the offices of director or principal officer unduly hazardous if the degree of direction normally required in the management of a corporation's manufacturing and selling activity could by itself make the director or officer personally liable for infringement by his company.

24   This is a principle that should apply, I think, not only to the large corporation but also to the small, closely held corporation as well. There is no reason why the small, one-man or two-man corporation should not have the benefit of the same approach to personal liability merely because there is generally and necessarily a greater degree of direct and personal involvement in management on the part of its shareholders and directors. This view finds support, I believe, in the cases. It has been held that the mere fact that individual defendants were the two sole shareholders and directors of a company was not by itself enough to support an inference that the company was their agent or instrument in the commission of the acts which constituted infringement or that they so authorised such acts as to make themselves personally liable. *British Thomson-Houston Company Ltd. v. Sterling Accessories Ltd.* (1924), 41 R.P.C. 311; *Prichard & Constance (Wholesale) Ltd. v. Amata Ltd.* (1925), 42 R.P.C. 63. It is the necessary implication of this approach, I think, that not only will the particular direction or authorisation required for personal liability not be inferred merely from the fact of close control of a corporation but it will not be inferred from the general direction which those in such control must necessarily impart to its affairs. I, therefore, have no difficulty in concluding, with respect, that the learned trial Judge was correct in holding that the fact "Goldenberg and Berkowitz imparted the practical, business, financial and administrative policies and directives which ultimately resulted in the assembling and selling of some goods (in National's over-all stock of goods) which I have found infringed the plaintiff's rights" was not by itself sufficient to give rise to personal liability.

25   What, however, is the kind of participation in the acts of the company that should give rise to personal liability? It is an elusive question. It would appear to be that degree and kind of personal involvement by which the director or officer makes the tortious act his own. It is obviously a question of fact to be decided on the circumstances of each case. I have not found much assistance in the particular cases in which courts have concluded that the facts were such as to warrant personal liability. But there would appear to have been in these cases a knowing, deliberate, wilful quality to the participation. See, for example, *Reitzman v. Grahame-Chapman and Derustit Ltd.* (1950), 67 R.P.C. 178[FN2]; *T. Oertli AG.v. E.J. Bowman (London) Ltd. et al*, [1956] R.P.C. 282[FN3]; *Yuille v. B. & B. Fisheries (Leigh), Ltd. and Bates*, [1958] 2 Lloyd's Rep. 596; *Wah Tat Bank Ltd. v. Chan Cheng Kum*, [1975] A.C. 507 (P.C.).

26   Although American decisions on this question must be consulted with caution because of the particular legislative provisions concerning patent infringement that apply in the United States, they are instructive, I think, on the general approach which they reflect to the policy issue involved in the personal liability of managing officers for patent infringement by a corporation. There were at one time two rather distinct lines of authority: one that tended to hold managing officers liable merely by virtue of their having authorized the acts which were held to have constituted infringement; the other holding that they should only be personally liable where they have acted "outside the scope of their official duties". See *Dangler v. Imperial Mach. Co.* 11 F.(2d) 945, where the two lines of authority are discussed at length, and the Court declares its preference for the second approach, with the following observation:

>       After due consideration of the various authorities, as well as the reasons back of the two positions, we

40 C.P.R. (2d) 164, 89 D.L.R. (3d) 195, 22 N.R. 161

>   adhere to the Crazier v. Mackie-Lovejoy Mfg. Co. decision, and hold that, in the absence of some special showing, the managing officers of a corporation are not liable for the infringements of such corporations, though committed under their general direction. The uncertainty surrounding the questions of validity and infringement make any other rule unduly harsh and oppressive.

27   This approach would appear to have prevailed. See *Panther Pumps & Equipment Co. Inc. v. Hydrocraft, Inc. 468 F.2d 225 (1972)*, in which the analysis in *Dangler* is quoted in full with approval. In *Southwestern Tool Co. v. Hughes Tool Co., 98 F. 2d 42,* I find the following statement of this approach:

>   An officer of a corporation participating in the corporation's manufacture and sale of an infringing article is not personally liable for damages flowing from such piracy unless he acts wilfully and knowingly, or uses the corporation as an instrument to carry out his own deliberate infringement, or knowingly uses an irresponsible corporation with the intended purpose of avoiding personal liability.

28   I do not think we should go so far as to hold that the director or officer must know or have reason to know that the acts which he directs or procures constitute infringement. That would be to impose a condition of liability that does not exist for patent infringement generally. I note such knowledge has been held in the United States not to be material where the question is the personal liability of directors or officers. See Deller's Walker on Patents, 2nd ed., 1972, vol. 7, pp. 117-118. But in my opinion there must be circumstances from which it is reasonable to conclude that the purpose of the director or officer was not the direction of the manufacturing and selling activity of the company in the ordinary course of his relationship to it but the deliberate, wilful and knowing pursuit of a course of conduct that was likely to constitute infringement or reflected an indifference to the risk of it. The precise formulation of the appropriate test is obviously a difficult one. Room must be left for a broad appreciation of the circumstances of each case to determine whether as a matter of policy they call for personal liability. Opinions might differ as to the appropriateness of the precise language of the learned trial Judge in formulating the test which he adopted -- "deliberately or recklessly embarked on a scheme, using the company as a vehicle, to secure profit or custom which rightfully belonged to the plaintiffs" -- but I am unable to conclude that in its essential emphasis it was wrong. Nor am I able to conclude that the facts of this case are such as clearly to give rise to personal liability on a proper application of the law. National was legitimately engaged in the business of assembling and selling retractable pens before Rotary entered into a relationship with it and before any question of possible patent infringement arose. There was considerable uncertainty as to the scope and application of the relevant patent claims. Moreover, the trial Judge refused to find that the molds obtained by National were made by copying the essential Rotary parts. These were all circumstances which clearly distinguish the present case, for example, from that of *Reitzman, supra*, in which the managing director of the defendant company had acquired his familiarity with the patented process in his former capacity as technical director of the plaintiff company, and there was a finding that the defendant company had in effect copied the process of the plaintiff company.

29   For the foregoing reasons I would dismiss the appeal with costs.

FN1.[1921] 2 A.C. 465

FN2. In this case Harman J. concluded that a case for personal liability had been made out but the action was dismissed on the ground that the patents were invalid. This judgment was affirmed on appeal: (1951), 68 R.P.C. 25.

FN3. In this case Roxburgh J. held directors personally liable for what he found to be a deliberate course of dishonest trading by the ccmpany, but both the Court of Appeal and the House of Lords held that there had not been passing-off by the ccmpany and declined to express an opinion as to whether, assuming there had been passing-off, the directors' involvement was such as to justify personal liability: [1957] R.P.C. 388 at 400, [1959] R.P.C. 1 at 6.

END OF DOCUMENT

Copr. © West 2007 No Claim to Orig. Govt. Works

40 C.P.R. (2d) 164, 89 D.L.R. (3d) 195, 22 N.R. 161

Copr. © West 2007 No Claim to Orig. Govt. Works