**EXHIBIT E**

- 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF TEXAS
               MARSHALL DIVISION
 3   MASS ENGINEERED DESIGN, INC.,)
             )
 4   ET AL      )
               )  DOCKET NO. 2:06cv272
 5     -vs-     )
               )  Tyler, Texas
 6   ERGOTRON, INC., ET AL  )  9:30 a.m.
               )  November 29, 2007
 7
 8        TRANSCRIPT OF MARKMAN AND MOTION HEARING
         BEFORE THE HONORABLE LEONARD DAVIS,
 9          UNITED STATES DISTRICT JUDGE

10              A P P E A R A N C E S
11   FOR THE PLAINTIFFS:    MR. MAX LALON TRIBBLE
                    MR. STEPHEN F. SCHLATHER
12                  SUSMAN GODFREY
                    1000 Louisiana St., Ste. 5100
13                  Houston, Texas  77002-5096
14                  MR. JUSTIN ADATTO NELSON
                    SUSMAN GODFREY
15                  1201 Third Ave., Ste. 3800
                    Seattle, WA  98101
16
17                  MS. DEBORAH RACE
                    IRELAND, CARROLL & KELLEY
18                  6101 S. Broadway, Ste. 500
                    Tyler, Texas  75703
19
20   ALSO PRESENT: MR. GREGORY MAAG, CONLEY ROSE LAW FIRM
        MR. JERRY MOSCOVITCH, INVENTOR AND PRESIDENT OF
21            MASS ENGINEERED DESIGN

22   COURT REPORTER:    MS. SHEA SLOAN
                    211 West Ferguson
23                  Tyler, Texas  75702
                    903/590-1176
24   Proceedings taken by Machine Stenotype; transcript was
     produced by a Computer.
25
```

2

```
 1   FOR THE PLAINTIFFS:    MS. ELIZABETH DeRIEUX
                    MR. JED ROLLINS
 2                  BROWN McCARROLL
                    1127 Judson Road., Ste. 220
 3                  P.O. Box 3999
                    Longview, Texas  75606-3999
 4
                    MR. CHARLES AINSWORTH
 5                  PARKER, BUNT & AINSWORTH
                    100 E. Ferguson, Ste. 1114
 6                  Tyler, Texas  75702
 7   FOR THE DEFENDANTS:    MR. KURT J. NIEDERLUECKE
                    MR. MATTHEW GRAHAM
 8                  FREDRIKSON & BYRON
                    200 S. Sixth St., Ste. 4000
 9                  Minneapolis, MN  55042
10                  MR. MARVIN CRAIG TYLER
                    MR. BRIAN A. DIETZEL
11                  WILSON SONSINI
                    8911 Capital of Texas Hwy.
12                  Westech 360, Ste. 3350
                    Austin, Texas  78759-7247
13
                    MR. ERIC H. FINDLAY
14                  RAMEY & FLOCK
                    100 E. Ferguson, #500
15                  Tyler, Texas  75702
16                  MR. THOMAS DUSTON
                    MARSHALL GERSTEIN & BORUN
17                  233 S. Wacker Dr.
                    6300 Sears Tower
18                  Chicago, Illinois  60605-6357
19
20
21
22
23
24
25
```

3

```
 1              P R O C E E D I N G S
 2        THE COURT:  Please be seated.
 3        All right.  Ms. Ferguson, if you will call the case,
 4   please.
 5        THE CLERK:  Case No. 2:06cv272, Mass Engineered
 6   Design v. Ergotron, Inc., et al.
 7        THE COURT:  Announcements?
 8        MR. TRIBBLE:  Your Honor, Max Tribble for the
 9   plaintiff, Mass Engineered Design.  I have with me from my
10   office Justin Nelson and Stephen Schlather.  Also with me is
11   Mr. Greg Maag from the Conley Law Firm.  And, of course,
12   Betty DeRieux, Charlie Ainsworth, and Jed Rollins.  We also
13   have with us today the president of our company and the
14   inventor, Jerry Moscovitch.
15        THE COURT:  Defendants?
16        MR. FINDLAY:  Your Honor, I will introduce the
17   defendants on behalf of CDW Corporation.  Myself, Eric Findlay
18   from the Ramey Firm, along with Thomas Duston from Marshall
19   Gerstein & Borun in Chicago.  And Kurt Niederluecke and
20   Matthew Graham in the gallery from Fredrikson & Byron in
21   Minneapolis.  On behalf of Dell we have Craig Tyler and Brian
22   Dietzel, Wilson Sonsini in Austin, ready to proceed.
23        THE COURT:  Very good.  All right.  It looks like we
24   have got a -- what at first I thought looked like a pretty
25   simple patent; but after looking at the briefing, I think
```

4

```
 1   y'all have managed to try to complicate it quite a bit.  But
 2   we will move ahead and go through it.
 3        I think first before I just get totally brain dead a
 4   little later in the morning, I would like to go ahead and deal
 5   with the motion to join the additional parties.  And I think
 6   really what I am interested in here, I have got the briefs,
 7   and I am really interested in, you know, whether adding them
 8   is going to move this case along and help it get resolved
 9   faster and more expeditiously or whether it is going to slow
10   it down because it is definitely out of time with the Court's
11   order.  So I would like to hear some brief argument on that
12   point.
13        MR. DUSTON:  Your Honor, if I could address those
14   points.  I think, Your Honor, that CDW finds itself in the
15   position of being sort of stuck in the middle here.  All we do
16   is essentially buy a product from one party and sell it to a
17   consumer.  And so we have been brought into this case with
18   respect to these products of these other five manufacturers
19   for the very reason that all we do is pass that product
20   along.  We are not in a position necessarily to defend these
21   products, nor are we really as well equipped as these
22   manufacturers are to discuss settlement or terms with the
23   plaintiffs with respect --
24        THE COURT:  Why didn't you bring them in prior to
25   the February deadline then?
```

5

1    MR. DUSTON:  Your Honor, we were not aware of their
2  claims of infringement with respect to these products until
3  after the February deadline.
4    THE COURT:  When?  Right about the same time --
5    MR. DUSTON:  It was about February 7th when we
6  received a diskette from the plaintiffs that indicated that
7  they had infringement contentions with respect to these other
8  manufacturers.  The only manufacturer identified until that
9  point was the manufacturer Ergotron that was named in the
10  Complaint.  When we received that word that these other
11  manufacturers were implicated, we immediately began
12  discussions with those manufacturers.  We had hoped that these
13  manufacturers would then assume the defense and also agree to
14  the indemnity obligations, but that did not occur, Your
15  Honor.  And they did not participate in the mediation that we
16  held I believe it was -- I may be wrong here, but March of '07
17  or in or about that time.
18    MR. NELSON:  December of '06.
19    MR. DUSTON:  Oh, all right.  Then they weren't at
20  the table at that time because they weren't known to us as
21  people who were accused of infringement.  So our efforts to
22  try and bring them in the case did not bear fruit.  So that is
23  why we contacted Mr. Nelson to suggest to him that we would
24  like an opportunity to file a third-party complaint.
25    THE COURT:  Okay.  Response?

6

1    MR. NELSON:  First, let me just respond.  It is in
2  the briefing, Your Honor.  But what Mr. Duston told me was
3  that deadline was due in a week and he would like a week
4  extension.  I said fine.  He didn't tell me that the original
5  deadline was February --
6    THE COURT:  I'm not concerned about the emails and
7  lawyers -- you know, I know there wasn't a firm agreement or
8  firm understanding.  I am more interested in what is going to
9  expedite us in getting this case moved.
10    MR. NELSON:  Yes, Your Honor, and we adamantly
11  oppose the additional 13 parties that they are trying to bring
12  into the case.  We think there has already been an exchange --
13  most of these documents have already been exchanged.  Fact
14  discovery is about keyed up.  Obviously, the Markman Hearing
15  is today.  Expert reports are due in a few months.  We are
16  talking about 13 different parties with different depositions,
17  different interrogatories.  And the reality of it is, this is
18  a dispute about an indemnity provision between CDW and its
19  suppliers.  It is not related to what we are asking for.  And
20  it will absolutely bog down the process.  It will make it much
21  slower.  And it very well might push the trial date.  At the
22  very least it will require much more extensive discovery than
23  what be pled for and what we want.  This, again, is an
24  indemnity dispute between CDW and its suppliers.
25    MR. DUSTON:  Briefly, Your Honor.  The indemnity

7

1  aspect of this doesn't introduce really any new issue.  The
2  basic indemnity question is whether or not these products
3  infringe.  There is really no issue with respect to whether or
4  not there are indemnity agreements or whether the transactions
5  are covered by the UCC.  The ultimate question is whether or
6  not these products infringe.  And that is going to be the very
7  issue that is going to be addressed in the underlying primary
8  action.
9    Whether we take discovery of these third-party
10  manufacturers whose products are accused of infringement by
11  way of subpoena or whether they are parties, 30(b)(1)
12  depositions or notices are issued to them, I don't think it is
13  going to expand the scope of discovery in any regard.  The
14  plaintiffs are not going to be called upon to produce any more
15  documents than they have already produced because my
16  understanding is they have produced all documents relevant to
17  the claims of infringement that they are making against not
18  only the parties that are in the case but the manufacturer's
19  products that are the subject of the third-party complaint.
20    THE COURT:  What is your opinion as to whether
21  bringing these 13 parties in is going to delay -- that they
22  are going to be asking for an extension of the scheduling
23  order that has now been in place for, what, a year and a half?
24    MR. NELSON:  Correct, Your Honor.
25    MR. DUSTON:  They have made no indication to us and

8

1  we have been in contact with them as I said from the moment
2  that we were first informed that their products were accused
3  of infringement.  We have kept them apprised of all of the
4  developments in the case.  We have afforded pleadings to them
5  as they have come in.  They have been on notice of this
6  Markman Hearing.  They were invited to come and at least
7  participate from the gallery, but they chose not to do that.
8    None of these defendants, potential defendants, have
9  indicated to us that they are going to be seeking any kind of
10  change to the scheduling order.  A trial on this case is not
11  set for another year from today, so I don't know if the order
12  even if it was needed to be amended would need to be amended
13  in any way that would affect the trial date in this case.
14    But as I said, Your Honor, none of these parties
15  have indicated to us their intent to try and alter the
16  schedule.  Now, we may be putting the cart before the horse.
17  If we bring them in and that is their request, then there may
18  be an opportunity to sever the claims against those defendants
19  and to put them on their own track, but I think we may be
20  jumping the gun.
21    THE COURT:  That was -- you mentioned the next thing
22  that I was going to throw out is what about going ahead and
23  bringing them into the case, keeping y'all on track.  The
24  Court is fully committed to the trial date and everything with
25  the existing parties that are in the case now, but at least

9

1 get them in the case and then we will have a status conference
2 with them after they are in and see what their position is.
3 And if they -- and the Court will decide then whether -- well,
4 they will decide first if they can live with the scheduling
5 order as it is. And if they can't, then I can either hold
6 them to it or sever them out and put them on a separate track
7 and not disturb this trial setting.
8 MR. TRIBBLE: Your Honor, I think with the Court
9 being sensitive to this issue that we might need to sever them
10 out for trial or other purposes, I think that would be fine.
11 THE COURT: Is that agreeable?
12 MR. DUSTON: That is agreeable to us, Your Honor. I
13 think we need to have them have a seat at the table --
14 THE COURT: I agree. I think that would be to
15 everybody's advantage and to their advantage because if you do
16 have valid indemnity against them and you proceed on, they are
17 at some point going to have an interest. They might as well
18 come forward and get involved and interested --
19 MR. NELSON: If I may ask Mr. Duston a question.
20 Have they consented to jurisdiction here? Are they going to
21 oppose any attempt for you to join them in this lawsuit?
22 MR. DUSTON: They have not indicated to us an intent
23 to oppose, but I don't want to represent they have told us
24 they won't. We just haven't had that conversation.
25 THE COURT: I understand you can't speak for them,

10

1 the Court is going to grant the motion to join additional
2 parties, obtain service on them just as soon as possible. And
3 as soon as you get them served and we get answers in, I will
4 ask you to notify my office and then we will -- try to give us
5 30 days notice and we will set a status conference for the
6 case for the purposes of seeing where all the new parties
7 fit in.
8 MR. DUSTON: Very good, Your Honor, thank you.
9 MR. NELSON: Thank you.
10 THE COURT: Thank you. All right. Now, with regard
11 to the summary judgment we will just take that up in the
12 course of the Markman Hearing when we get to the desired --
13 what is it called, desired visibility or angle?
14 MR. NELSON: Desired degree, Your Honor.
15 THE COURT: Desired degree. We will take it up when
16 we get to that. I need to move very quickly this morning, so
17 let's start with the '978 patent, and I would just like to
18 start with the claim construction terms as they appear, I
19 think would be the best way to proceed. And the first one is
20 "base member." And feel free to tell me that y'all have
21 agreed on something, and I will be glad to move on to the next
22 one.
23 MR. TRIBBLE: Your Honor, we had structured our
24 presentation, we had taken lead from the defendants and
25 rearranged ours to be in the same order that they had done

11

1 theirs. I think the key issues -- we are at the Court's
2 pleasure and we can do it in any order that you wish. I think
3 the key dispute in this case goes to the means-plus-function
4 limitations or one of them we say it is not and they say it
5 is, but I think that is the heart of the dispute on this claim
6 construction. And they had dealt with that issue first in
7 their brief. We had arranged it that way. We are happy to do
8 that. But if you want to start with "base" we would be happy
9 to do that, as well, Your Honor.
10 THE COURT: Well, whatever would be the most -- I
11 agree that the means-plus-function is the key factor. And
12 what is the first means-plus-function? "Positioning means."
13 MR. TRIBBLE: "Positioning means," Your Honor.
14 THE COURT: Let start with that one. I would just
15 say from the outset I think the first question -- let's see.
16 All right. Go ahead with that one. You are basically taking
17 the position it is not a 112, Section 6.
18 MR. TRIBBLE: That's correct, Your Honor. We have
19 cited it in our brief. I'm not going to go through it again.
20 But you are aware -- they jumped ahead here -- you know, we
21 have cited the cases to the Court about -- basically to
22 determine whether it is a means-plus-function claim. If it
23 recites the structure for performing the recited function in
24 the claim language, well then it is not a means-plus-function
25 claim; or at least 112 of Paragraph 6 does not apply. If it

12

1 does apply, then you need to specify what the function is; and
2 the construction of the structure that is included is just the
3 minimal structure for performing the recited function.
4 THE COURT: Which would basically be what the means
5 comprising is included in the --
6 MR. TRIBBLE: That's exactly our argument on that
7 one, Your Honor.
8 THE COURT: Okay. What is defendant's response?
9 MR. TYLER: Good morning. Craig Tyler for the
10 defendants on this issue.
11 Can we go to Slide 14.
12 Okay. So the question is, do all those words after
13 "comprising" does that give you structure, and does it give
14 you sufficient structure? And it looks like a lot of words, I
15 give them that. But even the cases that they cite, you really
16 have to look at how the courts address when a
17 means-plus-function term or a term that has the presumption --
18 this is "positioning means," so we start with the
19 presumption that it is a means-plus-function term. Mass has
20 overcome that presumption by showing there is sufficient
21 structure in here to actually perform the claim function in
22 the claims itself.
23 And I would like -- there are a few cases that point
24 this out quite well, and we have some slides on them. But in
25 looking at them, the Rodime case that Mass relies on actually

13

1  points this out quite well.  In that case what we had is a
2  patent on disk drives.  In the case -- that was actually a
3  case where you had a positioning means.  And the positioning
4  means was for moving a transducer means.  And in that
5  means-plus-function language there was a whole list of
6  structure beneath it.  And the means-plus-function term in
7  that case had -- here we see under Element A we have an arm
8  assembly, and have B a support means and C a mounting means
9  and it includes other functional language.
10     In that case you had a means for moving a transducer
11  that included two support arms, a pivot shaft, a positioning
12  arm, a bearing assembly, a stepper motor, a tensioned steel
13  band, and one functional language, a means for operating said
14  stepper motor.  There was also locational information.  There
15  was also interconnection information.  And so what the Court
16  said is you don't have to describe every last detail of
17  structure, but you have to have sufficient structure in the
18  claims to perform the entire function.
19     And what they said, they concluded here and said
20  that the structure specified in the claims has to tell what
21  the means is structurally.  So that is the issue, looking at
22  this do you know what the positioning means is structurally.
23  Looking at what we have here, we have an arm assembly, you
24  have a "support means," you have a "mounting means" and you
25  have "means for adjusting" --

14

1     THE COURT:  By the time you find the structure for
2  "support means," "mounting means" and "means for adjusting,"
3  won't you have sufficient structure?
4     MR. TYLER:  This is open-ended.  You have to refer
5  back to the specification to determine what these particular
6  structural components are.  It has to be from the claim
7  looking at it can you tell what this claim is structurally.
8  In the Rodime case you actually had all the structure in the
9  claim itself to perform the function.  There was a means term
10  in there, but that wasn't necessary for performing the
11  structure.  Here you have to go all the way back to the spec.
12  And it is important here --
13     THE COURT:  But aren't you just being duplicative of
14  repeating what you are going to be repeating down in the claim
15  term elements?
16     MR. TYLER:  Well, that is an interesting point
17  because what they are saying is that "means for adjusting the
18  angular orientation" is the same thing as "positioning means."
19  Now we have two "means" terms in here that mean the same
20  thing.  They chose to put this term in here, "positioning
21  means for positioning the displays."  They didn't have to
22  claim it in that "means" terminology.  You can't just look at
23  it and say it means nothing.  It means what we have here
24  below, but it still is open ended.
25     There is one piece of structure provided here, an

15

1  arm assembly.  What they are saying is we are entitled to
2  essentially take these other means-plus-function terms and
3  read them into the claim.  But what the Federal Circuit has
4  made very clear, and you will hear us talk about this a lot,
5  when you pick a "means" term, what the Federal Circuit has
6  said is that is a quid pro quo agreement that you are going to
7  specifically link to structure in the claim so we will know
8  the metes and bounds of that claim.  Here they have chosen
9  "positioning means."  That was an election that the applicant
10  had.  He didn't have to go with that term.
11     THE COURT:  Okay.  Response?
12     MR. TRIBBLE:  Well, two points, Your Honor.  First
13  of all, you are exactly right that because of the comprising
14  language when we finally fill in the structure in -- the
15  elements after the comprising, those are means-plus-function
16  claims.  That is agreed.  When we fill in the structure, it
17  all amounts to the same thing.  And, in fact, it is just like
18  any other element that has "comprising" in it.  Is the
19  structure there -- it is just like when it says "arm assembly"
20  if that were one of the Elements A, B, C, D after
21  "comprising," arm assembly may be something that you have to
22  look to the specification to understand what that means or
23  construe what that means, but that doesn't mean that arm
24  assembly is not structure.
25     In fact, this exact argument was rejected.  I looked

16

1  into this, and I found a case.  I admit that it is not cited
2  in our briefs.  But this exact issue where there was
3  means-plus-function claiming language with comprising.  And
4  then the sub-elements were themselves means-plus-function
5  claim elements, was considered by the court in the British
6  Telecommunications cases.  I want to give this cite.
7     If we could go to Slide 22.
8     We listed it in our slides that we have given to the
9  Court.  It is that bottom case cited there.  But it is at 189
10  F.Supp.2d 101.  It is out of the Southern District of New
11  York.  On Page 110 of that opinion, the Court considered this
12  argument that there is no structure because the sub-elements
13  are themselves means-plus-function claim elements.  And the
14  court says, "In the case at hand I find that the component
15  parts listed in the claim language describing the remote
16  terminal means state its structure."  The elements that were
17  in a means-plus-function claiming format the court found
18  stated the structure.  He says, "I do not find this
19  distinction that the sub-elements are means-plus-function
20  elements makes the meaning of the remote terminal means a
21  means-plus-function where radial positioning means does not.
22  The structure of the component parts is present.  It is just
23  found in a different part of the patent in the specification
24  rather than in the claim language."
25     And so, you know, this very argument was rejected.

17

1    The issue is does it recite the structure whether it is --
2    whether the sub-element is in a form that is not
3    means-plus-function, but it is a phrase that needs to be
4    construed by looking at the specification and intrinsic
5    evidence.  Everyone would agree that is sufficient structure
6    to be recited.  Or it makes no difference that the
7    sub-elements are in a means-plus-function claiming format and
8    the structure is spelled out in the specification.
9        MR. TYLER:  May I respond, Your Honor?
10       THE COURT:  Yes, you may.
11       MR. TYLER:  Go to Slide 17.
12       I want to talk about a case that is in the briefing.
13   This is the Altiris case.  And this is the Federal Circuit
14   dealing with a very similar issue.  In that case you had a
15   means for booting.  And the means for booting included two
16   structural components that were a first set of commands for
17   booting and a second set of commands for booting.  The Federal
18   Circuit looked at this and said, well, we have sufficient
19   here, we agree.  But the first set of commands for booting and
20   the second set of commands for booting are structure.  It is
21   not sufficient structure though.  And the "including"
22   suggested it was open-ended and that something else was
23   needed.
24       So here the court had to go back to the
25   specification and see what these commands specifically were.

18

1    What they were is the first set of commands was the normal
2    operating system on a resident machine and the second set of
3    commands were some batch files commands and structures that
4    were on the server.  And the commands for booting is very
5    similar to means-plus-function language.  You have some
6    structure there, but you have to go to the spec to determine
7    what that structure actually is.  And the Court said they
8    didn't find the specific physical structure that performs the
9    function in its entirety.  Physical structure was what they
10   were looking for in the claims.  They certainly found it when
11   they went back to the specification.  So this is what the
12   Federal Circuit says about this issue.
13       Now, you have the judge in New York that Mr. Tribble
14   was pointing to that looked at this issue and said it is okay
15   if I go find it somewhere in the specification.  But looking
16   at this again, if you are going to have a means-plus-function
17   term -- and they have to overcome the presumption that it is
18   not a means-plus-function term.  And the requirement is that
19   somewhere in the specification I have to know what that claim
20   structurally is.  And the Federal Circuit has said in these
21   situations when you have "including" terms beneath that -- and
22   I invite the Court to go back and look at the Altiris case on
23   this and see exactly the logic the court went through.
24       THE COURT:  Is there a difference between the
25   "including" term and the "comprising" term?

19

1        MR. TYLER:  I think the "comprising" is understood
2    to be more expansive and suggests it could include more.  It
3    doesn't necessarily have to include -- I suggest it is these
4    two components.
5        THE COURT:  All right.  Mr. Tribble, last word.
6        MR. TRIBBLE:  In the Altiris case the court found
7    you had means for booting and the issue was whether the term
8    commands for booting was sufficient structure.  The Court
9    found those two terms were synonymous; that they were saying
10   the same thing, so it didn't add anything.  I do want to point
11   out --
12       Can we go to Slide 11.
13       This is the heart of the case here, Your Honor,
14   because it goes to the point you had made earlier; that don't
15   we get to the same point if once we construe the
16   means-plus-function sub-elements and get that structure,
17   doesn't that give us the structure for "positioning."  I agree
18   with the Court, and here is the fight.  The fight is -- and
19   this applies to the other means-plus-function claims.  We will
20   both agree on what the function is because it is stated right
21   in there.  The function that we are talking about "positioning
22   means for positioning the displays."  That is all.  But if you
23   look at this claim language here you have to keep in mind,
24   Your Honor, that what defendants are doing is they are trying
25   to interpret -- they will say, well, that is the function to

20

1    position the display and what that means is, and then they
2    hook in all this stuff about it has to have horizontal and
3    vertical registration.
4        Where that is coming from, Your Honor, is the patent
5    originally issued and then it was put into reissue where
6    additional -- two additional claims were added.  And that is
7    important because those are the two asserted claims in this
8    lawsuit.  So you compare Claim 1 of the patent with Claim 16,
9    for example, the first asserted claim; and you see the
10   language is very similar but the language was changed.  This
11   stuff about horizontal and vertical registration was deleted.
12   And some other language was added.
13       I apologize.  It is hard to see, Your Honor.  If you
14   look at the "positioning means" box you will see that in the
15   original claim the "positioning means for positioning the
16   displays, selectively in vertically registered relationship
17   and in horizontally registered relationship."  That was the
18   function.  That was the recited function of Claim 1.  But that
19   is not the claim at issue here.  In Claim 16 that language was
20   deleted.  So now the function is different.  It is
21   "positioning means for positioning the displays."  The
22   function is -- it is just for positioning the displays.  It is
23   not with regard to whether it is horizontally or vertically
24   registered.  That is what the real dispute is here as to this
25   and the other claims.  I think we will learn a little more

21

1    about this in connection with the next claim limitation.
2          THE COURT:  Would you like to respond?
3          MR. TYLER:  Yes, Your Honor.  On the point that he
4    was trying to distinguish Altiris on, he said that what
5    happened was the Court said the first set of commands are
6    essentially the same thing as -- or the commands for booting
7    are the same thing as the means for booting.  What they are
8    saying about "positioning means" is it is the same as the
9    "means for angular adjustment."  They are conflating those
10   issues, as well.  It is the same exact analysis that the court
11   went through in Altiris.  They wrote this term in "positioning
12   means" format.  That is what they should live with in the
13   case -- unless they can rebut the presumption.  They just
14   can't.
15          We are going to hear a lot about this issue about
16   the function when they took this limitation out of
17   the claims.  But this case is so much different than what you
18   have in Rodime where in Rodime they actually had a
19   "positioning means" there, too.  But guess what?  In the
20   patent they talked about two different types of functions
21   related to the "positioning means."  In this case the entire
22   patent had one "positioning means" purpose, it repositioned
23   the movement of the displays between a horizontal and vertical
24   registration.  What they did with the reissue, the intent was
25   to go in and rip that sole function out that "positioning

22

1    means" had in the patent and now we are going to claim this
2    other tilting concept.  They did it with the
3    means-plus-function language that was specifically defined in
4    the patent.
5          And cases where you have multiple types of functions
6    that are all defined, this is a "positioning means," this is a
7    "positioning means" with separate structure provided for it,
8    that was the Rodime case.  There were two different types of
9    "positioning means" and it ultimately came out that there were
10   two separate functions called out for each of those separate
11   "positioning means" and then separate structure to perform
12   those functions.  Here what you are going to see is that there
13   is just one set of structure.  That is what we are ultimately
14   going to end up with.
15          And what the defendants are going to try to do is
16   abstract that structure up to something that is structural
17   open-ended language.  We are going to try to go back and say
18   you have got to stick with what you put in your specification
19   if you are going to use the means-plus-function terms.  That
20   dispute is going to come up again and again today.  This is
21   the first place it arises, but it won't be the last.
22          THE COURT:  Let's move on to the next term.
23          MR. TRIBBLE:  I believe the next term is the
24   "mounting means," Your Honor.
25          Let's go to Slide 32.

23

1          This will cut right to the chase.  It is not the
2    chase -- it is not the case that there was only one embodiment
3    disclosed.  There are several alternative embodiments
4    disclosed in the patent, and there is not just one function
5    disclosed.  It is not true, and we will get to the heart of it
6    right here.
7          Next slide.
8          THE COURT:  Well, let me ask, first of all, do y'all
9    agree on what the function is?
10         MR. TRIBBLE:  We do and we don't, Your Honor.
11         THE COURT:  That is what it looked like from the
12   briefing.
13         MR. TRIBBLE:  I mean you will notice all their
14   constructions are a lot longer than ours.  We say the function
15   is "mounting the displays to the arm assembly."  That is out
16   of the claim language.  If you look in the right-hand column
17   on this slide, they identify the claim function of "mounting
18   means" to be mounting the displays to the arm assembly, so
19   they agree.  Then it says, "which means the structure is
20   operable to permit the tilting of the display about two
21   mutually perpendicular axes and rotation of the display
22   relative to the arm."  So they are going to interpret --
23         THE COURT:  Where are you getting that limitation in
24   the function?
25         MR. TYLER:  That is what the patent defines it here

24

1    is what the --
2          THE COURT:  It is what?
3          MR. TYLER:  Here is what the mounting structure
4    does.  Let me get to the right slide.  The specification
5    really couldn't be more clear when it talks about the fact the
6    mounting structure performs these certain functions.  Again,
7    trying to take out the limitation -- we are referring to a
8    slide before.  Might as well put this one up here.  It is of
9    central importance to both sides' position.  It is a
10   fundamental issue in this case.
11         Now, importantly, Your Honor, this is a claim that
12   we both agree is a means-plus-function term.  So it is a
13   mounting means for performing some function.  And then we are
14   going to have to look to the corresponding and linked to the
15   specification.  What they are saying is -- and they went
16   through the reissue and they took out this portion right here,
17   that now has changed "means for positioning the displays."
18   That was here before, "means for positioning the displays."
19         And when you go to the patent it is not a logical
20   way to position the displays.  We are talking about that for
21   where mounting is concerned.  Down here in "mounting means."
22   "Means for mounting the displays."  "Means for mounting the
23   displays."  It hasn't changed from Claim 1 to Claim 2.  That
24   is the function.  And when you look at the specification --
25   there are a lot of ways you can mount displays.  I can mount

25

1    them on this table and affix them. I can mount them on the
2    back of a horse. There are a lot of ways to mount displays.
3    You have got to look at the specification. You can't ignore
4    it as to what the specific mounting function is.
5        Go to the next slide. Next slide. Next slide.
6        And we have looked at the specification as we show
7    on Slide 35 and it says specifically this mounting structure
8    performs two principal functions; to perform limited tilting
9    and to allow this rotation about the device -- of the displays
10   about an axis that is normal is what they are talking about
11   there. But on this limited function and what the function is,
12   you know the punch line on this is they try to abstract the
13   function up so they can abstract the specific structure that
14   is disclosed in the specification. And the reality of it
15   is --
16       Go to the next slide.
17       I don't know that it really matters, Your Honor,
18   which claimed function you look at or whose claimed function
19   is correct because we both identify the exact same structure
20   for this particular "mounting means" function, and that is the
21   ball joint assemblies, the mounting structures 50 and 52,
22   connectors 164 and 166. And Mass in its proposed
23   construction -- they need to have this up here, too.
24       THE COURT: You say it doesn't really matter what
25   function the Court accepts --

26

1        MR. TYLER: When you read all of the briefing this
2    doesn't matter at all.
3        THE COURT: Excuse me?
4        MR. TYLER: I'm sorry. When you read all of the
5    briefing this doesn't matter at all.
6        THE COURT: Okay. So you are good with accepting
7    plaintiff's proposed function?
8        MR. TYLER: I don't think they are correct, Your
9    Honor. I don't want to waste the Court's time. Our function
10   is correct. That is not where we need to spend our time today
11   because we both get back to the same answer. They are going
12   to agree that they have to look to the specification to define
13   the disclosed structure. We both point to the same exact ball
14   joints as you see in slide -- what slide are we on? Slide 36.
15   Those are mounting structures 52 and 50 and they are
16   connectors 164 and 166.
17       Now, in their construction, which you can see
18   here -- it is on the previous slide. I blew it up so we would
19   have that to refer to.
20       THE COURT: Isn't Figure 20 really -- isn't Figure
21   20 really the structure for the mounting means for mounting
22   the displays to the arm assembly?
23       MR. TYLER: Well, Your Honor, the inventor in the
24   re-exam said the mounting structure was 52.
25       THE COURT: 52, which is on which figure?

27

1        MR. TYLER: Figure 4.
2        THE COURT: Well, that is a very high-level
3    depiction of what 52 is, but isn't Figure 20 a more detailed
4    explosion of what Figure 52 is?
5        MR. TYLER: That's correct. Figure 20 shows that
6    same ball joint assembly. At a high level it is a ball
7    joint -- if you pull out all of the structure it is what you
8    have in Figure 20, and I don't think the parties disagree
9    about that. It is just how abstract is that construction
10   going to be. Are we going to call it what it is, a ball joint
11   and it is this ball joint in Figure 20? Or are you going to
12   have structural language, open-ended structural language where
13   we can call it -- and I think you have to refer to our Slide
14   34 with the comparison. And the comparison there shows what
15   they would like this corresponding structure to be is a
16   connector extending from the arm assembly and attached to the
17   back of the display supporting the display and all
18   equivalents.
19       THE COURT: Mr. Tribble, I have some real problem
20   with what you proposed even being structure because, I mean,
21   it is supposed to recite specifically to the specifications
22   what structure supports the function. And it just seems like
23   a general description to me.
24       MR. TRIBBLE: Well, that is a fair point. But, Your
25   Honor, as the Wenger case makes clear, it is -- you get the

28

1    structure from the specification, that's true; but it is
2    improper to -- just as it is improper in construing other
3    types of claims to import limitations from the preferred
4    embodiment, the Wenger case from the Federal Circuit makes
5    clear that in construing a means-plus-function claim element
6    you don't import all of the structure that was in the
7    preferred embodiment. You only import the minimal structure
8    necessary to perform the function.
9        THE COURT: Well, wouldn't Figure 20 and its
10   equivalents be sufficient structure?
11       MR. TRIBBLE: Not quite. Here is why. If you look,
12   this shows a ball joint.
13       THE COURT: No. 180 --
14       MR. TRIBBLE: Basically, our construction when you
15   get to the next sub-element of "mounting means" we are going
16   to say it is the connectors that are shown in the big-level
17   pictures with a joint because the actual function is for
18   tilting. Let me show you about the function.
19       Can we go to Slide 38.
20       This is important because this is what I am talking
21   about in connection with construing these claims. You have to
22   keep a close eye on exactly what the function is and identify
23   just the minimal structure necessary. This is it, Claim 1
24   where they had all of this stuff about to orient each of the
25   displays in its operative angular orientation when the arm

29

1    assembly is in either one of its first or second orientations.
2    That was either the horizontal registered or the vertical
3    registered. The function was changed. We deleted that
4    language, and it added the language at the bottom on the right
5    to thereby permit the displays to be angled towards each other
6    to a desired degree.
7        So the function that we are talking about is when
8    you have two displays it allows them to be angled towards each
9    other, you know, like a book. And so that is the function.
10    If you go back to Figure 20 you will see the ball in the ball
11    joint it has these little pins. The socket has these slots.
12    And so in that embodiment did it have pins and slots? Yes, it
13    did. Did it use those for the functionality of tilting the
14    displays towards each other to a desired angle? No. The pins
15    and slots are used to create hard stops on how far you can do.
16    The ball joint, it is just this, Your Honor. This allows the
17    angling towards each other.
18        And so our point about it is, as the Wenger case
19    makes clear, just because it is in the preferred embodiment
20    doesn't mean that it gets hooked in as part of the structure
21    in the claim construction. You only include the part of the
22    structure that is necessary to achieve the recited function.
23        THE COURT: So you are concerned about the
24    structure, the ball joint having the pins in it does not -- is
25    just one embodiment compared to what the claim language is?

30

1        MR. TRIBBLE: Yes.
2        THE COURT: What is your response to that?
3        MR. TYLER: There is no other embodiment that they
4    are trying to point to. And what they are attempting to do is
5    rewrite the specification with the reissue; and, of course,
6    you can't do that. There is disclosed structure. It is a
7    ball joint. You can look high and low, and you are not going
8    to find a hinge. You can look for other types of items. One
9    thing -- there are two cases that I do want to draw attention
10    to on this particular point. Can you take a
11    means-plus-function claim and then look at the spec and erase
12    components of the disclosed structure? So I abstract out to
13    the broad category of concrete. And it is not in our
14    briefs -- may I approach, Your Honor?
15        THE COURT: Yes, you may.
16        MR. TYLER: The Chiuminatta case which is one that a
17    lot of attorneys refer to in the means-plus-function. In
18    means-plus-function --
19        THE COURT: You can hand it to Ms. Ferguson.
20        MR. TYLER: And for the record this is 145 F.3d
21    1303, a case cited by the Federal Circuit in 1998. It is
22    very, very relevant here because in that case you had a means
23    for supporting the surface of concrete. And the trial court
24    ruled that, just like what the plaintiffs are asking for here,
25    that you can have a general definition of a support surface.

31

1    It was generally a support surface. There was only one
2    embodiment disclosed. That was a skid plate. What the
3    Federal Circuit came back in and said is the only embodiment
4    is the skid plate, and the trial court ultimately went to that
5    conclusion, and the Federal Circuit agreed that a broad
6    definition is inappropriate. Therefore, you have to look at
7    specifically what they disclosed. There was one embodiment.
8    It was a skid plate. That was the extent of the construction.
9    You had to go back to the specific structure. You couldn't
10    abstract up to some general support means.
11        There is another case that has the same exact issue.
12    It is Smith Industries, it is 183 F.3d 1347. I will provide
13    this to the Court as well. It hits the same issue.
14        MR. FINDLAY: May I approach, Your Honor?
15        THE COURT: Yes, you may.
16        MR. TYLER: So in that case it was a patent on a
17    manual resuscitator device. And these resuscitator devices,
18    they had a face mask, a valve, and importantly a squeeze bag
19    for applying the gas if you are going to try to resuscitate
20    somebody with this manual device, and it was a means for
21    supplying gas. And what the trial court said, they actually
22    said that function was supposed to be supplying gas under
23    pressure. And the Federal Court came back and said, no, all
24    that is recited in the claims is a function only for supplying
25    gas. It doesn't have to be under pressure. So this is

32

1    comparable to what you are hearing the plaintiffs say about
2    their function. They rip functions out, so, therefore, we are
3    entitled to a broader function. The nice punchline here is
4    that the Federal Circuit went back and said, but there is only
5    one corresponding structure --
6        THE COURT: Where do they say that? What page?
7        MR. TYLER: A double entry squeeze bag.
8        THE COURT: What page it that?
9        MR. TYLER: I have it highlighted.
10        THE COURT: Page 13.
11        MR. TYLER: 13, yes, Your Honor. And interestingly
12    there in that top paragraph in the middle it says, more
13    specifically, the specification does not describe a generic
14    squeeze bag but rather only a double-entry squeeze bag. That
15    became the construction, the double-entry squeeze bag. They
16    didn't get just all squeeze bags. They got double-entry
17    squeeze bags.
18        What this issue is going -- is really going to, Your
19    Honor, is the doctrine of equivalents. That is for a later
20    time. What we have to do here today is construe this with
21    respect to the structure in the spec. Now, if they want to
22    argue later on that a hinge is the equivalent of a ball joint,
23    what they disclosed, that is infringement and they can do
24    that. What they are entitled to is the structure in the spec
25    plus all the equivalents. They can't abstract up to --

33

1    THE COURT: I noticed in your proposed construction
2  though you don't give them "and equivalents."
3    MR. TYLER: Well, no, we do. We say it is a ball
4  joint and equivalents. We understand that the law allows them
5  to have equivalents, but that is not in the construction at
6  the construction phase --
7    THE COURT: Maybe I missed that, but I didn't see --
8    MR. TYLER: We agree with that, Your Honor. They
9  get a ball joint, which is their disclosed structure, plus
10  equivalents. That is what the law requires. But it is not
11  today for them to abstract up so all of a sudden they have
12  open-ended structural language. Again, going back to this
13  very important point they chose to draft this in "mounting
14  means" format. They have agreed now that it is a
15  means-plus-function term. They can't rewrite it today to be
16  an open-ended structural term of connectors. They could have
17  said, "wherein these things are mounted with connectors."
18  That language would have been more open-ended, but they used a
19  means-plus-function language.
20    So in that situation you have no choice to find that
21  the structure disclosed in the specification, and that is the
22  important component. You can look high and low and you are
23  not going to find broader areas of connectors or mounting
24  means other than these ball joints.
25    THE COURT: All right. Response?

34

1    MR. TRIBBLE: The cases cited don't apply here.
2  That's not what we are doing. First of all, let's be clear.
3  The "mounting means" are the connectors that connect the
4  displays to the arm. And inside the connector there is a ball
5  joint. And if you look -- I mean Item 172 is the ball
6  joint --
7    THE COURT: What figure are you on?
8    MR. TRIBBLE: Figure 20, Your Honor, that you
9  pointed out.
10    THE COURT: In item -- what is the ball joint?
11    MR. TRIBBLE: 172 is the ball for the ball joint.
12    THE COURT: Right.
13    MR. TRIBBLE: And our concern here, Your Honor, at
14  the end of the day is this is part of the "adjusting means."
15  It is inside the "mounting means" is the ball joint. And so
16  they say we agree it is a ball joint, but the construction
17  they put in their papers is, oh, they want all these pins and
18  slots and stuff. You see those are separately numbered, 180.
19  Those are the pins I am talking about. And they have a socket
20  and then they call out 178 the slots. And the issue is we are
21  not adding anything but you only incorporate the structure
22  that is necessary for the function. And all I can do is read
23  from the Wenger case where it says it is improper to restrict
24  a claim limitation to structure that was disclosed in the
25  preferred embodiment but was not necessary to perform the

35

1  recited function.
2    If, for example, Your Honor, they had said it is a
3  ball joint painted red, but the red paint didn't have anything
4  to do with the function of angling the displays, well, that is
5  not part of the structure that gets incorporated in the
6  construction even though, yes, it was in the preferred
7  embodiment. So maybe we have almost covered this but just to
8  be clear as to the "mounting means" and it is the
9  connectors that are disclosed. The claim language then
10  incorporates into the "mounting means" the means for
11  adjusting.
12    THE COURT: So you are saying the "mounting means"
13  looking at Figure 20 are which elements?
14    MR. TRIBBLE: Well --
15    THE COURT: I guess not 152. That is the back of
16  the display unit, right?
17    MR. TRIBBLE: Well, the mounting means it is
18  connected to the back of the display. You know, the mounting
19  is done by mounting it to the back of the display. So, you
20  know, I think it is fine to include 152.
21    THE COURT: All right. And 186, the screws; is that
22  part of it?
23    MR. TRIBBLE: Yes. I think, Your Honor, that it is
24  basically --
25    THE COURT: Let me ask the defendants if they agree

36

1  that 152 and 186 are part of the structure?
2    MR. TYLER: Yes, Your Honor.
3    THE COURT: And what about 182 is that part of the
4  structure?
5    MR. TYLER: I believe this whole assembly is part of
6  the structure. That is what they have disclosed, Your Honor.
7    THE COURT: Mr. Tribble, do you agree 182 is?
8    MR. TRIBBLE: I'm trying to look at what 182 is.
9    THE COURT: It is the back plate behind the socket
10  to the ball joint.
11    MR. TRIBBLE: We would say, Your Honor, that the
12  actual connector is basically 190 through 180 without the pins
13  and sockets shown as -- excuse me, 174 -- 172, Your Honor, the
14  socket -- 190 through 172 without 180 without 178, the slots
15  and pins.
16    MR. TYLER: Your Honor, there is something that is
17  just quite not right about that because if you look at their
18  construction they also include "attached to the back of the
19  display." So they are trying to include 152 in their
20  construction which is the back plate and where it is on there,
21  but they want to exclude the items in between that.
22    MR. TRIBBLE: As I said, Your Honor, it is fine to
23  include 152. It has to be mounted to the display, so I think
24  it would include 152.
25    MR. TYLER: But on that point it is not important to

37

1  the function. If they say the only thing that is important is
2  mounting means displays, it doesn't matter where they are
3  mounted. They can be mounted on the side, mounted on the
4  bottom. If that is their function, just mounting these
5  displays, it could be mounted anywhere. That is not important
6  if you are listening to their argument. That is put in there
7  plainly because they want to avoid some specific prior art
8  where it is attached on the end. That is why they want to
9  bring that particular limitation in, but they don't want the
10  rest of their ball-joint assembly here. It is just not right
11  to allow them to cherrypick here which of these specific
12  elements they want when they disclosed this ball joint, and
13  they wrote it in means-plus-function terms.
14  THE COURT: All right. But let me go through this
15  again. Does plaintiff believe that 152 is part of the
16  structure --
17  MR. TRIBBLE: Yes.
18  THE COURT: -- as shown in Figure 20?
19  Does defendant believe 152 is part of the structure?
20  MR. TYLER: No, not the location shown in 152. The
21  fact that it has to mount to a display, yes.
22  MR. TRIBBLE: On that point, Your Honor, remember
23  the "mounting means" is means for mounting the displays to the
24  arm assembly. If you can't connect it, you know, I don't
25  understand how you could mount the display.

38

1  MR. TYLER: It doesn't matter where it is. It
2  doesn't have to be on the back on the display. It could be on
3  the end of the display.
4  MR. TRIBBLE: It could have been on the end, but
5  that was not what was disclosed. As they say, we are stuck
6  with the structure we disclosed. What we disclosed was
7  mounting it to the back. When you look in the specification
8  when it refers to this, it says it is attached.
9  THE COURT: You disclosed a socket with pins on it,
10  too, didn't you?
11  MR. TRIBBLE: That's true, but that part of the
12  element, Your Honor, is not necessary to achieve the recited
13  function.
14  THE COURT: Okay. I guess that is what I am getting
15  down to then. Let me ask you then, Mr. Tribble, you believe
16  186 and 182 are part of the structure?
17  MR. TRIBBLE: Yes.
18  THE COURT: And defendant feels the same way?
19  MR. TYLER: Yes, Your Honor.
20  THE COURT: All right. And then 190 of Figure 20,
21  do both of you agree that is part of the structure?
22  MR. TYLER: Yes, Your Honor.
23  MR. TRIBBLE: Your Honor, we don't agree on that.
24  That is just a flat surface or a spacer. I don't think that
25  it is necessary to mount. You could do it without that.

39

1  THE COURT: All right. 170, which is the socket, I
2  take it you both agree that that is part of the structure but
3  plaintiff believes that 178 is not part of the structure and
4  defendant believes that it is, right?
5  MR. TRIBBLE: That's correct.
6  MR. TYLER: Yes, Your Honor. Again, on this point I
7  invite the Court to look at the Smith Industries case because
8  having two entries or one entry in the air bag was not
9  relevant specifically to means for supplying gas, but it was
10  the only thing they disclosed and the court said that is all
11  they get. You can't now say I will get any number of air
12  bags. They disclosed this ball joint with these slots in it.
13  THE COURT: All right. And then both of you agree
14  that 172 is part of the structure?
15  MR. TRIBBLE: Yes, Your Honor.
16  MR. TYLER: Yes, Your Honor.
17  THE COURT: And 174?
18  MR. TRIBBLE: Yes.
19  MR. TYLER: Yes, Your Honor.
20  THE COURT: 194?
21  MR. TRIBBLE: Yes.
22  THE COURT: 196?
23  MR. TYLER: I believe so, although I think -- is
24  that a center line?
25  THE COURT: I think it is a screw hole.

40

1  MR. TRIBBLE: It is a screw hole.
2  MR. TYLER: I believe it is part of the structure.
3  You have to screw it somehow.
4  THE COURT: And 188 and 184?
5  MR. TRIBBLE: Yes.
6  THE COURT: Or is that part of the arm -- is 184
7  part of the arm assembly?
8  MR. TRIBBLE: Well, it is an enclosure for the
9  connector, Your Honor.
10  THE COURT: Okay. Do you both agree that 184 is
11  part of the structure?
12  MR. TYLER: Yes, Your Honor.
13  THE COURT: We are down to basically, your main
14  disagreement is over the 152 and 180 and 178, right?
15  MR. TYLER: Yes, Your Honor. But may I take a
16  second to talk with my co-Counsel.
17  THE COURT: Yes, uh-huh.
18  (Pause in proceedings.)
19  MR. TYLER: Yes, Your Honor. We believe that the
20  pins need to be included in the structure and the slots.
21  THE COURT: Now, we have basically covered Figure
22  20, which is Item No. 3 of defendants' proposed structure. Is
23  defendant comfortable if the Court were to go with Figure 20
24  in some fashion -- and I will decide the question regarding
25  the pins and the slots in the back of the display, but do

41

1 you -- is defendant comfortable with omitting your items No. 1
2 and 2 that I think deals with the same thing but just on a
3 more detailed level?  Or do you think those are important?
4 Figures 8 and 9, basically.
5         MR. TYLER:  Give me a moment, Your Honor.
6         (Pause in proceedings.)
7         MR. TYLER:  Yes, Your Honor.  I believe Figure 20
8 captures it.
9         THE COURT:  Excuse me?
10        MR. TYLER:  Yes, Your Honor.  Figure 20 captures it.
11        THE COURT:  And you can do without Items 1 and 2 in
12 your claim construction chart?
13        MR. TYLER:  Yes, Your Honor.
14        THE COURT:  Mr. Tribble, is that agreeable with you?
15        MR. TRIBBLE:  Unfortunately not, Your Honor.  If you
16 look at Figure 9 this doesn't have the back plate and doesn't
17 have the screws.  So, of course, this is a different
18 embodiment.  I know that is what the specification calls for.
19 allows, you know, a mounting means that doesn't have the back
20 plate and screws.
21        THE COURT:  Okay.  You want Figure 8, too?
22        MR. TYLER:  Yes, Your Honor.
23        THE COURT:  Okay.  So, in other words, if the Court
24 is going to identify structure based on the figures, you would
25 want all three items that defendants have proposed included as

42

1 the structure with the Court making --
2         MR. TRIBBLE:  With the caveat we don't like the pins
3 and slots --
4         THE COURT:  I know you don't like the pins.
5         MR. TRIBBLE:  That's true, Your Honor.
6         THE COURT:  I will look at the law on that; but,
7 otherwise, you would be agreeable with the structure as they
8 have identified it with the exception of the pins and the
9 slots on the ball joint on those related figures?
10        MR. TRIBBLE:  Can I have my co-Counsel take a look
11 at that and if there is anything we want to identify perhaps
12 come back to that?
13        THE COURT:  Go ahead --
14        MR. TRIBBLE:  I think the answer is probably, yes,
15 but rather than waste the Court's time --
16        THE COURT:  It is not a waste of my time.  I want to
17 get it done and move on.  So, go ahead.
18        MR. TRIBBLE:  Okay.
19        THE COURT:  We will take a five-minute break while
20 you are doing that.
21        MR. TRIBBLE:  Thank you, Your Honor.
22        (Recess was taken.)
23        THE COURT:  All right.  Please be seated.
24 What did we decide, Mr. Tribble?
25        MR. TRIBBLE:  Your Honor, basically we want the

43

1 structure in Figures 8, 9, and 20 as discussed.  And when you
2 talk about 1, 2, and 3 of the defendants, keep in mind that
3 there are two different constructions, slightly different,
4 proposed by the two sets of defendants.  So going through them
5 we would like, of course, the language -- because it is the
6 accurate language -- of the Ergotron CDW defendants where when
7 they lay out 1, 2, and 3 it says the structure must include at
8 least one of the following, of course, because they are
9 alternative embodiments.  We feel that is important language.
10        Then as to their -- we are agreeable in general to
11 this hooking in of Figures 8 and 9.  But they include not only
12 the slots and what we have been calling pins but they also
13 talk about steel balls and plastic sockets, which is not -- it
14 is not part of the structure.
15        THE COURT:  Well, that was a question I was going to
16 raise with the defendants.  I know that is what the
17 specification calls for.  But we are going to be dealing with
18 "and equivalents" anyway.  Isn't that just going to be
19 confusing to the jury, you know, to put that in there; or do
20 you think that is important to have the material that these
21 things are made out of?
22        MR. TYLER:  Your Honor, I don't think that it is
23 important to have the material in there.
24        THE COURT:  I think they are agreeable, Mr. Tribble.
25        MR. TRIBBLE:  Excellent.  Your Honor, going through

44

1 Figures 8, 9, and 20 I noticed one more thing.  You know, 8
2 and 9 don't have the screw holes on the back of the monitor,
3 you know, for the actual mounting.  Whereas, Figure 20 that
4 Item 152 that the parties are in disagreement about, those are
5 the screw holes, you know, from mounting this to the monitor.
6 So it is included on that embodiment.
7         With that, Your Honor, I think that we have covered
8 "mounting means" and "means for adjusting."
9         THE COURT:  I want to be sure I know where we are.
10        MR. TRIBBLE:  Okay.
11        THE COURT:  Defendant is agreeable to accepting
12 plaintiff's function as contained in the claim construction
13 chart, correct?
14        MR. TYLER:  Your Honor, I don't know that we agree
15 their function is accurate, but we get back to the same
16 structure.  But I believe their function is, again, not the
17 function called for in the patent.
18        THE COURT:  I thought you had said earlier it really
19 didn't matter.
20        MR. TYLER:  It doesn't matter that much with the
21 construction.  It will matter later on when they start raising
22 their equivalents arguments.  When they start trying to say
23 this is a hinge, that is why they are trying to have this
24 abstract function like that.  So I think the function does
25 matter but not with the corresponding structure because we

45

1  both get back to the same corresponding structure.
2      THE COURT:  Okay.  So do you agree or not agree with
3  plaintiff's proposed function?
4      MR. TYLER:  No, Your Honor, we do not agree.
5      THE COURT:  All right.  Am I correct that plaintiff
6  agrees with Ergotron's proposed structure as presented in the
7  claim chart with the exception of the pins and slots and
8  socket joint?
9      MR. TRIBBLE:  And the materials.
10     THE COURT:  And the materials, which I think
11 defendants have agreed is not --
12     MR. TYLER:  Yes.
13     MR. TRIBBLE:  And with the exception, Your Honor,
14 that on the Figure 20 embodiment we believe it includes the
15 back.
16     THE COURT:  The 152.
17     MR. TRIBBLE:  152, yes, Your Honor.
18     THE COURT:  Okay.  And I take it Ergotron is
19 agreeable with that?
20     MR. TYLER:  Yes, Your Honor, except to the extent
21 that 152 we don't believe it matters where it is attached.  It
22 shows it in some portion of the back of the device, but we
23 don't believe that component is necessary.  It does have to
24 attach somewhere to the display.
25     THE COURT:  Well, I don't think Figure 20 shows

46

1  where in the back it attaches, does it?  It just shows it does
2  attach to the back.
3      MR. TYLER:  That's right.  We don't think it has to
4  attach to the back.  It could attach to the side also.
5      THE COURT:  Is it what?
6      MR. TYLER:  It could attach to some portion of the
7  side if there was a connector there.  It could still mount the
8  displays -- it could still allow them to adjust angularly.
9      MR. TRIBBLE:  The parts of the specification
10 describing that item and describing the "mounting means" in
11 general all say it mounts to the rear of the display.  So I
12 think it is not clear from the figure, perhaps, but in the
13 description in the specification it does make it clear it is
14 attached to the rear of the display.
15     Put up Slide 40.  It is listed there.
16     MR. TYLER:  Your Honor, 152 in the patent is called
17 the display.  It doesn't say the back of the display.  It is
18 showing a portion of the display.
19     THE COURT:  Where in the specification does it
20 say --
21     MR. TYLER:  Column 7 it is referring to it when it
22 is talking about the display 152.  And that is in and around
23 Lines 11 -- I'm sorry Line 13 it looks like it just talks
24 about the display; 52 -- 152.
25     THE COURT:  Column 7, line what?

47

1      MR. TYLER:  13.  It also refers to it in Line 18.
2  It is called the display 152.
3      THE COURT:  Where are you saying, Mr. Tribble, that
4  it says it attaches to the back of the display?
5      MR. TRIBBLE:  If you will look at the screen there,
6  Your Honor, we put up Slide 40.  And this shows that Column 3,
7  Lines 63 through 66, it talks about the mounting structure
8  supporting from the rear of the display.  And then, again,
9  Column 7, Lines 9 through 11, the plate 182 is then fastened
10 to the back of the display.
11     THE COURT:  Response?
12     MR. TYLER:  Well, again, they spend a lot of time
13 talking about how -- they don't want the pins and slots in
14 there because they say they don't relate to the function of
15 having to mount these displays.  That location doesn't either.
16 So our thought is that 152 should be constructed and to the
17 jury that it has to mount to the display.  That's what it
18 calls for in the specification.  That is all that is required
19 for that function or our claimed function for that matter.
20     MR. TRIBBLE:  We could have had such an embodiment,
21 but we didn't.  We could have disclosed the embodiment where
22 it attached on the side, but it is not there.  There is a
23 difference between omitting structure in the preferred
24 embodiment that is not necessary for the function and
25 rewriting the specification to come up with, you know,

48

1  attached in a different way or something.  In other words, the
2  embodiment we disclose is attached in the rear.
3      THE COURT:  But you are not limited to just that one
4  embodiment, are you?
5      MR. TRIBBLE:  I am just talking about the structure
6  of what is disclosed.  It is the "mounting means."  We all
7  agree the screw is there.  How can you have the screws and
8  not -- the screw holes in the back of the display where it
9  attaches, how could it be mounted otherwise?  So, you know,
10 that is our only point about mounting it to the rear of the
11 display.  It is "and equivalents."  So whether there are
12 equivalents out there, that is for another day.
13     THE COURT:  I want to go back for a moment to the
14 ball socket.  And let me ask both sides to comment on the
15 slots and the pins, are they necessary to the mounting
16 function of the assembly?
17     MR. TRIBBLE:  Where the ball socket comes in is that
18 the "mounting means" includes -- this is broken out as a
19 separate element, but it includes a "means for adjusting."
20 And if you look at the function of the "means for adjusting,"
21 it is "adjusting the angular orientation of each of the
22 displays relative to the arm assembly."  And in the
23 specification it makes clear that the slots and pins are stops
24 that put a restriction on how far the angle can be changed;
25 but as far as the function of actually adjusting the angular

49

1  orientation, that is done -- it is just like this.  It is this
2  movement right here.  It is not the pins and the slots.  That
3  is just a restriction.
4          THE COURT:  The pins and slots are not necessary to
5  hold the ball in the socket; that is held in by a spring and
6  the circumference of the socket being smaller than the
7  diameter of the sphere?
8          MR. TRIBBLE:  That's true, Your Honor.
9          MR. TYLER:  Your Honor, in looking at what Mr.
10  Moscovitch told the world when he was in the reissue process
11  about the mounting structures when he was talking about
12  getting these claims allowed, he wanted to explain where his
13  structure was to support that he could amend his claims like
14  this, and what he said.  He said, "It is explained that the
15  mounting structure 50 mounts one display 50" --
16          (Court Reporter requests Mr. Tyler to slow down.)
17          MR. TYLER:  I'm sorry.  "It is explained that
18  mounting structure 50 mounts one display, 16, to permit
19  limited tilting of the display about two mutually
20  perpendicular axes."
21          THE COURT:  Where are you reading from?
22          MR. TYLER:  This Page 5 -- well, the actual Bates
23  number is DEL-041937.  And in our --
24          THE COURT:  Do you have it in your handout book?
25          MR. TYLER:  Yes, Your Honor.  It is attachment

50

1  Exhibit B to our opening -- or is that Exhibit B to
2  plaintiff's -- Exhibit B to our opposition, Your Honor.
3          THE COURT:  Do you have it on your chart in your
4  presentation?
5          MR. TYLER:  I don't think so.  I will put it up on
6  the Elmo.
7          MR. TRIBBLE:  What is that Bates number?
8          MR. TYLER:  DEL-041937.  I will see if I can somehow
9  magnify this.  Wrong way.
10          Now, when Mr. Moscovitch is explaining to the world
11  what his mounting structure is, he believes it important to
12  call out this able to tilt about two mutually perpendicular
13  axes.  It does seem like it conflates at times between what
14  the "mounting means" is and what the "means for angular
15  adjustment" is.  But that is one subcomponent of the other.
16  He is talking about the mounting structure here and how it
17  permits this tilting about two axes.  That is what these slots
18  do, they enable this tilting about two axes and --
19          THE COURT:  Is this relating to the reissue or the
20  original?
21          MR. TYLER:  This is the reissued patent, Your Honor.
22  This is what he is describing as support for his reissued
23  patent.
24          THE COURT:  Mr. Tribble?
25          MR. TRIBBLE:  Well, I don't understand the point,

51

1  Your Honor.  He is describing the preferred embodiment.  In
2  the reissue the specification didn't change, so when you are
3  describing the preferred embodiment, it is what it is.  Did
4  the preferred embodiment allow horizontal and vertical
5  registration?  Some of the embodiments did.  So when you are
6  describing that, that is fine.  If you look at the bottom of
7  this page --
8          Can you move that up a little and see the next
9  part.
10          What he was talking about earlier he talks about the
11  two -- limited tilting about two mutually perpendicular axes.
12  Now, in this second part it says from above it, it is
13  submitted that rotation about a generally vertical axis of the
14  two screens is amply described.  Okay.  That is Claim 17 that
15  is at issue.  That is one -- only one direction of tilting.
16  So what he is saying is the preferred embodiment describes
17  doing it two ways over two perpendicular axes, and he is
18  saying from that disclosure it amply describes rotation in one
19  direction.  If you disclosed how to do it in two dimensions,
20  you have disclosed how to do it in one.  So, you know, I don't
21  understand exactly what the point is.
22          MR. TYLER:  Your Honor, may I respond to that?
23          THE COURT:  Yes.
24          MR. TYLER:  This is a very interesting invention if
25  the way you look at it in the way that those ball -- those

52

1  slots work it can allow you to work about one axis like
2  that or tilt like that or this way.  But, see, this whole
3  device was designed to go this way as well, to spin about a
4  normal axis.  So even when it spun, these balls -- these slots
5  and these pins where they are arranged, even when you spin you
6  can still move it about this generally vertical axis.
7          How do you keep it about this generally vertical
8  axis?  You have to have the slots engaged there so it stays
9  like this.  Even when you go this way in 90 degrees you can
10  still go like that because you have got these separate slots
11  and pins.
12          MR. TRIBBLE:  It doesn't matter.  Okay.  First of
13  all, let's be clear.  The pins, or projections as they are
14  called, and the slots are called out as separate items.  The
15  only question is, what is necessary for the function to do
16  this?  Yeah, you could put all kinds of guides and you can
17  have pins and slots that can limit it in all different
18  directions and make it easier.  The question is, if you have a
19  ball socket like this, are you able to turn it and angle it
20  towards the other monitor or away from the arm?  The answer is
21  yes.  That is all that is needed to achieve the recited
22  function.
23          THE COURT:  And does defendant agree that the pins
24  and slots are only to maintain a vertical and horizontal
25  limitation on the ball joint and are not necessary to hold the

53

1  ball in the socket?
2      MR. TYLER: Yes, Your Honor.
3      THE COURT: Okay. So we really come down to whether
4  the claimed invention does or does not or is or is not limited
5  by pins and slots having to be there, right?
6      MR. TYLER: Yes, Your Honor. I think, you know, Mr.
7  Tribble talked about the fact that we sort of talked about the
8  "angular adjusting means" at the same time. I agree that is
9  correct. It is not clear to me where exactly Mr. Moscovitch
10  wanted this function to reside, in the "mounting means" or the
11  "angular adjustment means," but it is there. It is mutually
12  perpendicular axes being able to tilt about a vertical axis
13  and keep it on that vertical axis. That is why the pins and
14  needles -- or the pins and slots are there.
15      So I think that is the issue. And I don't know
16  which one of these "means" it resides in, which we were trying
17  to explore that in deposition, but we were not able to. And
18  that is why it is a central issue to us here.
19      THE COURT: Okay. Have we pretty well exhausted --
20  well, let me just ask, does Dell and DMLP -- I know you have
21  submitted separate constructions than Ergotron, do you wish to
22  be heard with regard to your disagreement with that?
23      MR. TYLER: Your Honor, we are speaking
24  collectively.
25      THE COURT: It would have really, really been

54

1  helpful to the Court if y'all could have spoken collectively
2  before you submitted the claim chart. I don't know how much
3  time I have spent going through trying to figure out what the
4  two of you are disagreeing about.
5      MR. TYLER: You're right, Your Honor. We attempted
6  to several times, and we did talk about that several times.
7  And I think there is only minor variations. But I can tell
8  you right now that we will just go with their -- Dell will go
9  with Ergotron's claims. I'm sorry to the extent it caused
10  problems.
11      THE COURT: All right. I would also like to know
12  how much time plaintiff spent with defendants meeting and
13  conferring over the proposed function and structure? How much
14  time did y'all spend meeting and conferring trying to come to
15  some agreement over this?
16      MR. TRIBBLE: Your Honor, I am going to have my
17  co-Counsel -- I was in trial in San Francisco, Your Honor,
18  during a lot of this conferring. I just don't know the
19  answer.
20      MR. NELSON: Mr. Tyler can correct me if I am wrong.
21  Mr. Maag and I were on the phone with them for at least a
22  couple long conversations over the course of a couple days at
23  least. I think each conversation lasted a couple of hours.
24  Correct me if I am wrong. Around there.
25      MR. TYLER: Justin, I am going to go with you

55

1  because that was with Scott Morris that actually has cancer
2  now and can't be in the case.
3      MR. NELSON: Oh, my God.
4      MR. TYLER: But you dealt with Scott, so I will go
5  with whatever you said.
6      MR. NELSON: This is from the best of my
7  recollection, so I am -- we traded papers back and forth as
8  well.
9      MR. TRIBBLE: I saw the emails, Your Honor. There
10  were considered conversations and everything and the exchange
11  of positions and things. You know --
12      THE COURT: Well, it would have been very helpful to
13  the Court, too, Mr. Tribble, if the plaintiff, who has now
14  agreed with defendants' proposed structure minus these two or
15  three things that you are arguing about, if that agreement
16  could have been reached before we got all this briefing and
17  trying to figure out where you are coming up with this
18  structure out of the penumbra and where we really knew -- you
19  know, it has taken us -- we have been here two hours to get to
20  what should have been in the briefs so the Court could have
21  spent its time dealing with this issue of whether the pins and
22  slots should be erased out of the figures or whether they
23  shouldn't. I am being handed up highlighted copies; and, you
24  know, this isn't doing any of your clients a service or the
25  Court a service. You are just wasting time and money of

56

1  everybody.
2      MR. TYLER: Your Honor, I believe that we had --
3  there was a definite issue with respect to whether they could
4  go with this very high-level abstract structure. We couldn't
5  get past that point. If we would have agreed that we are
6  going to both look to the specification and pull the structure
7  out, I would think we would have been through the pins and
8  needles very quickly. But we had to get some elbow grease to
9  get past that one issue.
10      THE COURT: All right. What is next?
11      MR. TRIBBLE: Well, I think, Your Honor, that we
12  have covered the "means for adjusting." It is part of the
13  "mounting means." So I think that the next term is "support
14  means."
15      THE COURT: All right. Before we leave the pins
16  and -- I want a less than 10-page brief from both sides with
17  no replies or surreplies dealing with this issue of whether I
18  should take the eraser and take the pins off or whether I
19  should leave the pins on. That would be helpful to the Court.
20      MR. TYLER: Your Honor, may I suggest something? In
21  the interest of saving time -- I haven't discussed this. But
22  if they would agree to where it is on the back of the display,
23  we would probably agree to the pins. Or conversely we could
24  go -- we could probably go either way on that. They are both
25  very -- whether you include the back of the display and

57

1    whether you include the pins and slots is the same type of
2    argument.  And, perhaps, if we could talk about that for a
3    second we could agree on whether they both should be in or
4    they both should be out.  Does that make sense?
5         THE COURT:  The Court will take a five-minute recess
6    while you discuss it.
7         (Recess was taken.)
8         THE COURT:  Please be seated.
9         All right.  Where did we end up?
10        MR. TRIBBLE:  Your Honor, we were unable to reach
11   agreement on that.  As plaintiff views it, the pins and slots
12   are not necessary for that function; whereas, you know, the
13   back -- if you are going to have the screw for a mounting
14   means, you can't attach it unless there is a hole, you know,
15   to screw it into the particular holes in the back of the
16   display in the disclosed structure.  So I think we just see it
17   differently.
18        MR. TYLER:  We don't care whether they are both in
19   or both out.  They are saying they are apples and oranges.  It
20   is called the "mounting means."  We don't believe what it
21   mounts to actually should be part of the "mounting means."
22   That's why where it is on the back and that part of the
23   assembly we don't believe needs to be in.  But it is the
24   preferred embodiment.  If they are going to bring that in, the
25   projections and slots should also come in.  If you are going

58

1    to bring out your eraser, the same logic applies.  We believe
2    they should both be out or both be in.  We don't have
3    agreement on that, so at the Court's pleasure I suppose we can
4    submit something on that.
5         THE COURT:  If y'all will submit those supplemental
6    briefs to us by -- what is today?  Thursday.  Have those to us
7    by, say, Tuesday afternoon; something like that.  That give
8    you enough time, or do you need a little more time?
9         MR. TYLER:  Yes, Your Honor.  That should be enough
10   time for the defendants?  What was the limitation on that?
11        THE COURT:  Page limit?
12        MR. TYLER:  Yes, sir.
13        THE COURT:  Ten pages.  Double spaced, 12 point
14   type.
15        MR. TRIBBLE:  Your Honor, in that 10 pages, did you
16   want briefing on just pins and slots or also the issue about
17   the back of the display?
18        THE COURT:  The back of the display, too.
19        MR. TRIBBLE:  All right.
20        THE COURT:  You can use your 10 pages however you
21   want to.
22        MR. TRIBBLE:  Thank you, Your Honor.
23        THE COURT:  All right.  What is next?
24        MR. TRIBBLE:  I wanted to make sure we are in
25   agreement that the "means for adjusting" I believe we have

59

1    covered that?
2         MR. TYLER:  Just to be clear are we saying it is the
3    same structure or is it some subcomponent of the "mounting
4    means"?  There is a specific construction that will apply.
5         MR. TRIBBLE:  Right.  In other words, I think that
6    the construction that we went through, Your Honor, about
7    "mounting means" that includes the socket and the ball and all
8    that, I mean that is -- it is the same issue for the "means
9    for adjusting" because it is part of the "mounting means."  We
10   broke it out separately, and they put it in their first
11   construction.  That is one we kind of working off of.  So
12   I don't think there is anything else to discuss unless you
13   want us to go through -- specifically go through the numbers
14   again on the "means for adjusting."
15        THE COURT:  Go through what numbers?
16        MR. TRIBBLE:  You know, the items about -- well, the
17   socket that goes in -- and we will say, no, to the slots and
18   pins --
19        THE COURT:  Same as for as the "mounting means,"
20   right?
21        MR. TRIBBLE:  Yes, Your Honor.
22        THE COURT:  What is next after --
23        MR. TRIBBLE:  "Support means."
24        Go to Slide 61.
25        This sets out the difference here.  The function is

60

1    supporting the arm assembly above a support surface and -- let
2    me see if I can get this working.  As we go through our slides
3    here, I am trying to -- I don't have the defendants'
4    construction right here.  Oh, here it is.  This is another one
5    where they try to redefine the function about what it means.
6    Ours comes straight from the claim language that the only
7    function that we are concerned with here is "means for
8    supporting the arm assembly means from the base member."  And this
9    goes back to that same issue as before.
10        THE COURT:  Okay.  Defendants --
11        MR. TRIBBLE:  About the language that was deleted
12   from Claim 1 during the reissue.  And basically our objection
13   here is they are trying to incorporate a lot of extra
14   structure to rewrite the function to be like the function in
15   Claim 1 as opposed to what was actually included as the
16   rewritten function in Claim 16.
17        Specifically, Your Honor, our structure that we
18   identified for this means is in -- well, the easiest one is
19   Figure 19 -- actually, what I decided to do here, Your Honor,
20   I think we are going for the defendants, with Ergotron's
21   constructions so I tried to go with their list here.  On the
22   first embodiment number one we agree with the upright member,
23   that is Item 20 with a circular recess.  You have got to have
24   a hole in it, which is Item 34.  This is in Figure 7, Your
25   Honor.  I apologize.  I decided to switch and use their

61

1    chart. It is in figure 7.
2            THE COURT: All right.
3            MR. TRIBBLE: We believe that the structure is the
4    upright Item 20, the hole, Item 34.
5            THE COURT: Circular recess?
6            MR. TRIBBLE: Circular recess. It is like a hole
7    only more expensive. And the bolt, Item 38.
8            THE COURT: You do not believe it includes the
9    cylindrical recess 34?
10           MR. TRIBBLE: No, or the biasing spring, Item 48, or
11   the washer.
12           THE COURT: What is that? What is 46, 48 --
13           MR. NIEDERLUECKE: Your Honor, I can probably
14   address that since we would ask that those be included in the
15   structure. That is the mechanism in which it is supported in
16   a position. Without that -- what basically happens there is
17   the spring biases out the ball, which then connects with the
18   circular recess configuration on the back of the arm. So, in
19   other words, without that what you would have is an arm that
20   would just spin around and flop. But what that does is that
21   circular recess -- there is actually two of them in Figure 7,
22   there is two circular recesses, and those coordinate with the
23   pin and biasing spring to have the arm supported in either the
24   horizontal position or the vertical position, Your Honor. So
25   those are necessary to support the arm; otherwise, you have an

62

1    arm that spins and spins and spins.
2            MR. TRIBBLE: May I respond, Your Honor?
3            THE COURT: Yes, you may.
4            MR. TRIBBLE: Your Honor, with the spin it will be
5    held up. What it is for is it is for this horizontal and
6    vertical registration. It is used to be part of the -- it is
7    part of function of Claim 1 perhaps, but the asserted Claim 16
8    and 17, it is not part of the function of that support means,
9    so it is not necessary. Does it hold up the arm without the
10   biasing spring, you know, that would make it level perhaps and
11   make it perfectly horizontal or perfectly vertical? Yes, it
12   holds it up. That is why that additional structure is not
13   necessary.
14           THE COURT: In what column and line is 46, 48, and
15   44 referenced? Or stated another way, what does the spec have
16   to say about it?
17           MR. NIEDERLUECKE: Column 3 describes this I believe
18   at about Line 45.
19           MR. TRIBBLE: It shows that second recess has a
20   little ball with a spring behind it, and then in the circular
21   Item No. 40 there are the little indentations where the ball
22   will catch on. So it is not just supporting, it is now
23   doing this horizontal or vertical registration that was the
24   point of the reissue to delete that aspect of the claim
25   language.

63

1            MR. NIEDERLUECKE: And, Your Honor, slightly above
2    that it actually describes two functions of the rotary joint
3    starting at Line 30. It describes those two functions as,
4    first, to support the arm for rotation about a generally
5    horizontal axis through the upright 20. And all of these
6    pieces are required, all these elements are required to
7    support it for rotation about a generally horizontal axis
8    through the upright.
9            The second is to define distinct vertical and
10   horizontal arm positions. Now, whether you agree with the
11   defendants or agree with the plaintiffs on the function and
12   whether or not it has to be able to be placed in a horizontal
13   and vertical position, that is the secondary function there.
14   The first function, which is to support it for rotation about
15   a generally horizontal axis, is described and requires the pin
16   and the biasing spring to be able to rotate.
17           THE COURT: But the claim term we are dealing with
18   is a support means for supporting the arm assembly from the
19   base member -- or "a support means for supporting the arm
20   assembly from the base member." It doesn't have anything to
21   do with rotation, does it?
22           MR. NIEDERLUECKE: We think it does, Your Honor. We
23   think the only function that is identified -- and this goes
24   back as a theme throughout this patent. As you stated in the
25   beginning, you thought this was a simple patent. And reading

64

1    the patent it is a simple patent. And it is a patent that
2    demonstrates rotation of two screens between a horizontal and
3    a vertical. This booking and all the construction that we are
4    trying to get to is to say it has nothing to do with that, it
5    just has to do with angling the screens, that is not in the
6    patent. The tilting is the closest they come. And even
7    tilting in the patent is described as a transient operation.
8    It is a transient operation only so you can rotate the
9    screens. There is nothing in here that discloses a system
10   that is intended to be a static system that doesn't have an
11   ability to be placed in two different positions. And each of
12   the embodiments shows that, Your Honor.
13           THE COURT: Okay. Mr. Tribble, what is your
14   position with Items Nos. 2 and 3 of the structure?
15           MR. TRIBBLE: Well, Item 2 -- Item 2 is Figure 12.
16   As to that one we say it is the upright Item 105 and the shaft
17   Item 114.
18           THE COURT: And what do you say the vertically
19   parallel horizontal rotary shafts 118 and 112 and 120 are?
20           MR. TRIBBLE: 118 and 120 --
21           THE COURT: In other words, the other two structures
22   that defendant --
23           MR. TRIBBLE: That goes as to this. This is Slide
24   56. The applies to the other embodiment we just talked about.
25   This is the deleted claim language. So the point of it is,

65

1  usually the support means, it was a "means for supporting the
2  arm assembly from the base" selectively in a first orientation
3  and in a second orientation.  So the support means in the
4  function recited in Claim 1, that would require some support
5  means that did this horizontal, vertical registration.  As you
6  see, now it says just supporting.  So our position on those
7  other two items, Your Honor, those are not necessary for the
8  functions actually at issue in the asserted claims which is
9  just supporting the arm assembly from the base member.
10  THE COURT:  Response?
11  MR. NIEDERLUECKE:  Your Honor, I would say in Figure
12  12 if you had nothing more than that central shaft there, I
13  can promise you those two displays would fall to the floor.
14  Those displays are not attached to the central shaft 114.  The
15  central shaft includes pulleys.  It includes the horizontal
16  rotary shafts 118 and 120.  Those are the shafts that then
17  connect to the pulleys which connect to the arms -- the
18  pulleys within the arms.  So that central portion by itself
19  does not even attach to the arms.
20  I would also note, Your Honor, one point here and
21  what we have disclosed in the embodiments that are in our
22  presentation at 30 through 32 -- Pages 30 through 32 are very
23  limited in that we are disclosing just -- we are trying to
24  disclose there just the mounting structure as distinguished
25  from the "positioning means."  And I would just to be clear,

66

1  so the Court is clear about our position -- and this goes back
2  to whether the "positioning means" is open-ended and described
3  properly -- on Pages 23 through 25 the "positioning means" in
4  terms of the structure includes all of the connection means
5  there so that you have all of the positioning on how they
6  connect the arm with the support.  And that is part of our
7  "positioning means" structure, so we believe that is
8  necessary.  I just wanted to point the
9  distinguishing factor between now we are just talking about
10  the support itself, and we believe that at least substantial
11  function has to include -- or substantial structure has to be
12  included that is necessary to support the displays at least in
13  a stable position.  In Figure 12 at least the vertical
14  parallel horizontal rotary shafts 118 and 120 have to be
15  included in the structure that is necessary to support the
16  displays.
17  THE COURT:  Okay.  Thank you.
18  MR. TRIBBLE:  I don't have anything to add on Figure
19  12, Your Honor.  I don't think this is going to come up as an
20  issue.  There is no -- I'm not aware of any accused products
21  that look anything like Figure 12.  I'm not sure one has ever
22  been made ever.  So I'm happy to stand on our briefing and
23  stuff on Figure 12, I guess.
24  The third one, Your Honor --
25  THE COURT:  Let me ask you if we can just have an

67

1  agreement that we take --
2  MR. TRIBBLE:  No. 2?
3  THE COURT:  No. 2 out of the structure.
4  MR. TRIBBLE:  That is what I was hoping you would
5  suggest that, Your Honor.  I don't know if it is allowed.
6  Plaintiff is happy to do that.
7  THE COURT:  How about defendant?
8  MR. NIEDERLUECKE:  Your Honor, defendants would be
9  fine taking the No. 2 embodiment out of the definition.
10  THE COURT:  Okay.  No. 2 is out.  Thank you.
11  No. 3?
12  MR. TRIBBLE:  Figure 19, Your Honor, we believe the
13  structure is the upright Item 158 and the fastener Item 210
14  and the hole in Item 208 that the fastener goes into.
15  THE COURT:  Okay.  Response?
16  MR. NIEDERLUECKE:  Your Honor, if you have nothing
17  more than a hole there and the bolt, you wouldn't secure that
18  as I've discussed earlier with the first embodiment --
19  THE COURT:  I guess it would have to be a threaded
20  hole, right?
21  MR. NIEDERLUECKE:  That is -- again, we step back to
22  the -- you know, what we started with today was I believe
23  starting from a support component, and now we have at least
24  agreed there has to be something other than a component.
25  THE COURT:  Yeah, a component of the arm assembly

68

1  you are saying?
2  MR. NIEDERLUECKE:  Right.  I think here we would
3  require that at least 206, the socket with a square chamber --
4  and again that is to position this at least in a position.  It
5  is to support it in at least a position.  And then the
6  circular cylindrical chamber which under our construction of
7  the function is required to allow the user to pull the arm
8  out, turn it, and reinsert it 90 degrees.
9  And one of the points, Your Honor, I would like to
10  make about this support means, one of the positions in Claim
11  17 is that mounting means and the angular orientation of each
12  of the displays to be tilted, as they would say, about a
13  generally vertical access.  So they say and Mr. Tribble has
14  certainly demonstrated these have to be able to be tilted
15  about a generally vertical axis.  Now, if you have nothing to
16  secure the arm -- to support the arm in a horizontal position,
17  then this tilting won't occur.  They can't tilt towards each
18  other around a generally vertical access.  I think we are just
19  into whether or not it includes -- the only difference is
20  whether or not you have to require a mating socket and
21  cylinder to support it.
22  THE COURT:  Okay.  All right.  What is next?
23  MR. TRIBBLE:  "Base member" and "base."
24  THE COURT:  That is where I wanted to start this
25  morning.

69

1          MR. TRIBBLE: Yes, Your Honor.
2          THE COURT: I like to get the easy ones first. All
3    right.
4          MR. TRIBBLE: You know, we put up on the chart the
5    differences in our constructions, you know, the basic
6    difference is that both sides I believe are agreed that "base"
7    and "base member" should be construed the same way. They just
8    disagree on what the construction should be. I think the
9    basic disagreement is that we believe that the "base" is the
10   lower most portion of the system for resting on a work
11   surface, and defendants believe that "base" need not be the
12   lowest-most portion or resting on a work surface.
13         And this is added because in the reissue the
14   examiner specifically required "base" to be added to the
15   reissued claim. And when -- in the file history the inventor
16   specifically noted that the "base" is something that supports
17   the arm assembly above a work surface, and that is what we
18   told the examiner when we added "base" back in. And so, you
19   know, it is clear that is the purpose of that. We have cited
20   to the Court the dictionary definitions of "base." You know,
21   they are listed here. And all of them have this concept of
22   being something that is the bottom of or the lower part of the
23   foundation that supports something. That is basically where
24   we get our construction of "base" and "base member."
25         THE COURT: Defendants?

70

1          MR. NIEDERLUECKE: If we could go to Slide 45.
2    Your Honor, there is just a couple of disputes
3    between the parties on this. One is whether or not it is
4    required to be the lower-most portion of the system, and the
5    other is about whether it is supported above a "work surface."
6    Work surface -- working backwards, work surface is never
7    mentioned in the specification. It is not even mentioned in
8    the claim. It is a support surface. And Mass has attempted
9    to modify support surface and call it a work surface. And,
10   frankly, I can tell you exactly why they do that.
11         And if you go back to Slide 43.
12         The reason is the picture to your right there, the
13   piece of prior art showing displays. And the reason they want
14   to incorporate and bring in a work surface is because this is
15   placed into an airplane, into an airplane. So they want to
16   say it has to be supported above a work surface. I assume the
17   argument as well, the floor or base of this device isn't the
18   work surface. So what they are attempting to do here is
19   incorporate, juxtaposed to what they have been doing earlier
20   this morning, now they want to incorporate a term that is not
21   in the simple and straightforward support surface and
22   incorporate this even into the "base member."
23         And if you go to Slide 46.
24         Two things you will note, Your Honor, when you look
25   through the patent, first of all as I mentioned, work surface

71

1    is never mentioned. No surface is actually shown in any of
2    these drawings. Every one of these drawings in here floats in
3    space. And to the extent that the patent discusses a surface
4    at all, it simply describes a horizontal surface in the
5    description. So the fact that Mr. Moscovitch in rebutting
6    what was actually a recapture argument that was in the
7    original claims. He pulled it out. And the Patent Office
8    said wait, wait, wait. We may have to -- forced you to put it
9    in the first time. You have got to put it back in.
10         The fact that he identifies as one intended use a
11   work surface, doesn't now magically limit that term "support
12   surface" to a work surface. So the first one it shouldn't say
13   work surface to the extent it is supported above something.
14   It is above a support surface, which if you were going to
15   limit it you would possibly call it a horizontal surface.
16         Also, when you examine the infringement contentions
17   that Mass has made in this and presumably made in good faith
18   looking at the construction that they would propose in the
19   infringement, they have identified a number of Ergotron
20   products that show a base that is not the lowest portion and
21   is not secured to a work surface or shown to be placed above a
22   work surface.
23         So I think there is certainly some question about
24   whether their position has changed or what is going on. Their
25   position on that is that was just preliminary. I mean, we can

72

1    both cite extrinsic dictionary definitions that either mention
2    that it can be at the lower-most portion or describe it as a
3    supporting part or layer, but the two points here are
4    certainly their position previously has not required it to be
5    at the lower-most portion. There is nothing in the
6    specification that requires it to be at the lower-most
7    portion. And to read in that type of limitation is doing
8    nothing more than read it in from their own preferred
9    embodiments and one of their statements of use.
10         MR. TRIBBLE: May I respond?
11         THE COURT: Yes.
12         MR. TRIBBLE: Can you put it on Slide 73.
13         The spec does, in fact, show the base is something
14   that was at the bottom and sat on top of another surface, a
15   work surface. We've quoted the patent that talks about one of
16   the purposes of the invention was to conserve a limited desk
17   space and it specifically calls out that the base stands on a
18   horizontal surface. That is Column 3, Lines 20 through 23.
19   So it was disclosed.
20         And, moreover, when these two claims were added, the
21   asserted claims in this case, the examiner required "base" --
22   it wasn't us that put "base" in there. It was the examiner.
23   And we specifically noted in the file history for everyone to
24   see, that they have been amended to include the limitation
25   relating to the base. This component is used to support the

73

1    arm assembly above a work surface.  It is right there in the
2    file history.  It is believed that this places Claims 17 and
3    18 in form for allowance.  You know, certainly we cited it as
4    being a reason for allowance of the claims.  And it is right
5    there in the file history that "base" is something above a
6    work surface.
7            THE COURT:  Thank you.  Let's move on to the next
8    term.
9            MR. TRIBBLE:  Yes.
10           Slide 78, "support surface."
11           Your Honor, this is the same argument.  You know, I
12   have read you the quote from the file history about the aspect
13   that we thought put it in the position for allowance.  And it
14   specifically referred to of a work surface -- above a work
15   surface.  And that is -- so our construction is that the work
16   surface -- that the support surface is a work surface that
17   supports the base.  Other than that, it is just the ordinary
18   meaning of the words.
19           I did want to point out that we did use this in the
20   specification.  At Column 1, Lines 18 and 19 we pointed out
21   that paired monitors can be inconvenient, however, where
22   limited desk space is available.  Then, again, Column 3, Lines
23   20 and 22 where it specifically calls out that the base is
24   configured to stand on a horizontal surface.  That surface is,
25   of course, the "support surface," and that is basically where

74

1    we get our construction from.
2            THE COURT:  Response?
3            MR. NIEDERLUECKE:  Your Honor, first of all, we are
4    not talking about means-plus-function anymore.  You don't look
5    to the spec to determine where the structure is.  We are
6    talking about a term that is support surface, fairly
7    simply defined.  And you don't look to the spec and limit it
8    to a preferred embodiment.
9            Secondly, and I won't reiterate my statements I just
10   previously made, but, again, we are now into
11   non-means-plus-function.  The plaintiff is happy to go to the
12   summary of the invention and explain to the Court that the
13   whole purpose of this invention is to accommodate limited desk
14   space.  Do you know what the point of that is?  The point is,
15   if you need to, this display can be set horizontally or
16   vertically.  If you need some more space put it top to bottom.
17   So when it shouldn't be reviewed, they jump to the
18   specification and say limit it.
19           In the means-plus-functions they pulled the words
20   out of it, as the Court described it, the penumbra.  So there
21   is just nothing here in a single intended use that may be one
22   of the uses for a support surface.  To work above a work
23   surface does not mean you incorporate in that limitation to a
24   separate word.  In fact, if Mr. Moscovitch in adding "base"
25   back in and dealing with "support surface" thought it was a

75

1    work surface, why didn't he write "work surface"?  Why didn't
2    he say "work surface" anywhere in his specification?  Why in
3    his reissue didn't he call it a "work surface."  It is because
4    it is not there and it is not supported.  That limitation is
5    not within this patent.
6            THE COURT:  Okay.  What is next?
7            MR. TRIBBLE:  "Arm assembly."
8            Go to Slide 85.
9            This sets out the constructions, Your Honor.  And,
10   basically, they are very similar.  The main dispute is whether
11   an "arm assembly" can be something that has one or more parts
12   or extensions or -- as we say.  Or whether it has to have two
13   or more, as the defendants say.  And, you know, our basic
14   position is that there is nothing in the claim language or
15   the specification that shows we intended to limit it.  And, in
16   fact, you know, the specification makes clear that you can
17   have a single arm or a one-piece arm.
18           The term "arm assembly" was just used as a term that
19   would capture both embodiments where the arm is of one piece.
20   They have arms where it extends off both sides, and there is
21   one monitor on each end of the single arm.  And then there are
22   other embodiments where there are multiple arms involved, and
23   it is just a single phrase that could capture both of those.
24           THE COURT:  Response?
25           MR. NIEDERLUECKE:  Your Honor, they want to write

76

1    out "assembly."  The patent distinguishes between an arm and
2    an "arm assembly" and refers to it in different contexts.
3    That is the one versus two.  We think it is clear that by
4    calling it an "assembly," there has to be at least two parts.
5    That is the only issue there.
6            Secondly, the construction that Mass has proposed
7    defines them as extensions.  And, in fact, not only is
8    extensions not in the patent, extensions isn't even in the
9    dictionary definition that the plaintiffs provided.  In fact,
10   the dictionary definition just talks about an arm projecting.
11   And so what Mass has said is that the dictionary says arms
12   project and so because it says project, that is close enough
13   to what we want to call it and we want to call them
14   extensions.  That is the support they give in their papers,
15   Your Honor.
16           To the extent that the Court would agree with the
17   dictionary definition that it is a structure that projects --
18   that two or more constituent parts that project from another
19   structure or structures, that is fine.  But certainly
20   extensions and whatever is connoted within that definition,
21   isn't supported either by the patent or by the dictionary
22   definition that is provided.
23           THE COURT:  Okay.  What is next?
24           MR. TRIBBLE:  Your Honor, just in rebuttal, I wanted
25   to cite you to the abstract.  It just shows that as we use the

77

1  language, you know, "arm assembly" was not limited to
2  something that required two or more parts.  It was one or more
3  because right in the abstract we talk about different
4  implementations but we say in a simple implementation the arm
5  assembly is a rigid arm.  Okay.  That you basically take the
6  arm and put it on horizontally or vertically, but it was a
7  single arm.  And that is the main point of that.  I don't
8  think the key issue is up about the word "extensions" or so forth.
9  I think the key issue is one versus two.
10     Well, the next I am happy to announce is "electronic
11  displays."  The parties are in agreement.
12     With that, the final term is going to be handled by
13  Mr. Nelson.  That is "angled toward each other to a desired
14  degree."
15     MR. NELSON:  Your Honor, we are at your pleasure
16  about whether you want to hear this in terms of the
17  construction or whether you want to hear this as part of the
18  summary judgment motion.  In our briefs, we had a proposed
19  construction and they had a proposed construction.  In their
20  briefs they said they are happy to have no construction.  We
21  said we are happy to have no construction but we had an
22  alternative construction.  So I am happy to discuss that.  I
23  am happy to have Mr. Tyler present their summary judgment
24  argument and respond to that as well.
25     THE COURT:  Why don't we go ahead with the summary

78

1  judgment argument first.
2     MR. TYLER:  Yes, Your Honor.  Craig Tyler on behalf
3  of the defendants on this motion.  We have a different slide
4  deck for this, so it is outside the deck related to the claim
5  construction.  I direct your attention to that slide deck.
6     So the purpose of the definiteness requirement is to
7  ensure that the terms are going to delineate the scope, the
8  metes and bounds of the invention.  Hopefully, that is going
9  to give notice to the public of where their right to exclude
10  is.  The case law that we have both cited is there has to be
11  some objective standard.  And the term at issue here is "to a
12  desired degree," and that comes from the new added matter in
13  the reissue in both claims.  To thereby permit said displays
14  to be angled towards each other.  All right.  So that is the
15  booking.  And how much to a desired degree.  Same exact
16  language you have in Claim 17.
17     So the reissue has added this language.  "To a
18  desired degree" was found nowhere in the original patent at
19  all.  This concept was brought out about the adjustability of
20  the device.  In the reissue -- the focus here is whether "to a
21  desired degree" is definite or not.  And there are two ways
22  the plaintiff is going to argue it is definite.  One, they are
23  going to try to ignore it and read it out of the claim.  Or,
24  two, they are going to try to rewrite it.
25     But as it is there in the claim, as it modifies the

79

1  adjustability of this device, there is just no workable,
2  objective way to measure it, whether I know if I am infringing
3  this device or not.  What we know is -- and you need to look
4  at the language.  Unfortunately -- I appreciate the Court's
5  patience with us today on all these items, but this one we
6  really need to roll our sleeves up on and look at what is here
7  because "desired" by itself doesn't make it indefinite.  It is
8  how it is used.  And "desired" modifies the word "degree" or
9  "to a degree."
10     "Degree" is a unit of measurement; how hot it is,
11  how far you rotate.  Obviously this is referring to rotating.
12  I am rotating about some degree.  How far?  To a desired
13  degree.  That is the modifier that is going on here.  There
14  are other types of patents that use "desired" in a different
15  way.  This is using it to modify a unit of measurement.  In
16  modifying that way, it makes it indefinite.
17     Let's go to Slide 5.
18     A case that you see both the defendants and the
19  plaintiffs rely on here is the Datamize case.  It really laid
20  out a lot of lot of useful information.
21     Slide 5.
22     We pulled a quote out.
23     That is not the right quote either.  Another slide
24  forward.  No.  Slide 5.
25     Okay.  That is the quote I was looking for because

80

1  it actually deals with degrees.  "When a word of degree is
2  used, the Court must determine whether the specification
3  provides some standard for measuring that degree."  That is
4  what is at stake here.  There is a desired degree and it
5  raises a lot of questions.  There is just no objective
6  standard.
7     You can go to the next slide now.  The point on this
8  and one of the things that you will hear plaintiffs do is say,
9  well, "to a desired degree" just relates to the adjustability,
10  just the fact that it is adjustable.  But that is not right
11  because the preceding language -- and they want us to read
12  this in the context -- says to thereby permit displays to be
13  angled towards each other.  That is the adjustability.  "To a
14  desired degree" tells us how much.
15     It raises all these questions.  One has to ask
16  themselves if they are determining -- within or without this
17  claim language, how much is that?  What is the range?  Max?
18  The min?  And then desired by whom?  What if the user desires
19  it to be outside the limited tilting provided by the patent?
20  Because this patent provides for limited tilting.
21     You can go to the next slide.
22     This is the point.  Two different individuals --
23  let's say I desire it to be booked all the way closed, that is
24  how I want it; but this device can only tilt or book about 20
25  degrees.  Your Honor might desire it to only book five

81

1  degrees.  In that situation when you are using it, it is
2  infringing; but when I am using it, it is not because it won't
3  go to my desired degree.
4      And you will also hear the plaintiffs talk about how
5  it is a viewer selected.  Again, that puts it in the
6  subjective view of the viewer.  What is desirable to one
7  viewer may not be desirable to another.  I may not be able to
8  get it to my desired degree.  I may desire it, like I said, to
9  be closed or to be booked quite a bit.  But these devices have
10  limited tilting.  And it doesn't correspond to this particular
11  claim language.
12      Go back to the previous slide.
13      And so the viewer-selectable aspect of it when they
14  are trying to change "to a desired degree" to be some sort of
15  viewer selectability, that doesn't add any more objective
16  rationale to it.  So what you will hear, I believe, what I am
17  interested in knowing is what is the objective standard that
18  would allow one when looking at this to know whether it is
19  adjustable or not, but what that "to a desired degree" means.
20  What is the range?  Because "to a desired degree" is much
21  different than some of these other cases.
22      I do want to talk about one case, and specifically
23  it is a SuperGuide case that was cited in the opposition by
24  Mass.  And in that case -- that case was a patent about the
25  interactive TV programming guide technology like TiVo or DVR,

82

1  and it was a guide for what -- this is a guide for what Mass
2  was looking at, why they want to say viewer selectable because
3  they can jump on in SuperGuide from that.  There they were
4  looking at a desired format.  In that case it was a desired
5  format was the particular at-issue claim.  And it was for
6  viewing television programming information.
7      Now, both the defendant and the plaintiff had their
8  own interpretations of desired format and what it meant.
9  There was never an issue about whether it was indefinite or
10  not.  They both agreed to it that they both had their own
11  interpretations.  One said it is a format that is limited to
12  what the viewer chooses.  And the other one said it is a
13  format that can be chosen by the viewer or the service
14  provider or some other party.  And it was just who were the
15  viewers that could choose the format?  That was the issue.
16      "A desired format" is much different than "to a
17  desired degree" because "to a desired degree" is modifying
18  this amount of adjustability, and there is just no objective
19  standard.  So to the extent they could find cases where
20  "desired" by itself with other claim terms didn't render the
21  patent invalid -- in the SuperGuide case it wasn't even an
22  issue.  But also it kind of nicely contrasts our situation
23  here where we are trying to look at what this additional
24  modifier is on the adjustability.  We just don't know where --
25  other cases that wasn't the issue.  You are seeing how much --

83

1  or to how many degrees or to what extent there are degrees.
2      So fundamentally --
3      You can go to the last slide, Slide 8.
4      In their earlier construction briefing, Mass's
5  arguments on this, they defined it with a lot of subjective
6  terminology, convenient positioning, viewer's discretion,
7  convenience to the viewer, this is the viewer's position.  And
8  you can't leave claim construction -- not claim construction,
9  but you can't leave a test on whether you infringe or not to
10  be dependent upon the individual viewer looking at the device
11  because, as I said, some people may want to look at more than
12  the device allows.  If I desire it to be booked more, it is
13  not infringing when I use it.  But if you desire it to book
14  within the range, it is allowable at what?  For that reason it
15  is indefinite, it is not capable of being construed.
16      Thank you, Your Honor.
17      THE COURT:  Response?
18      MR. NELSON:  Yes, Your Honor.  First let me just
19  give you an overview.  And one thing they don't talk about --
20  so they are moving for summary judgment, obviously the same
21  summary judgment standards apply.  We have not had expert
22  discovery yet.  So at the very least let me just start out by
23  the fact if everything else is wrong that I say, at the very
24  least under 56(f) we would request expert discovery on this
25  very issue.  But I think you can deny it now with prejudice

84

1  for a few reasons.
2      First, the words are understandable themselves, so
3  the phrase should be.  That comes from the Bancorp case.  I
4  will talk about that in a couple seconds.
5      Second, Dell's own patents the standard is what
6  would be a person of ordinary skill in the art understand?
7  Well, Dell's own patents use the term "desired" in ways very
8  similar to what Mr. Moscovitch uses in his patent.  And then
9  they talk about the Datamize case.  They don't, of course,
10  talk about the very part of the Datamize case that says
11  "desired" does not make the term indefinite.
12      Then, finally, the case law allows flexibility in
13  claiming devices that have varying dimensions.  Again, what is
14  the proper test here?  This is from Orthokinetics and
15  Bancorp.  Whether those skilled in the art would understand
16  what is claimed when the claim is read in light of the
17  specification.  Bancorp, the claim is not indefinite unless it
18  is insolubably ambiguous.  And if it can be construed, it is
19  not invalid for indefiniteness.
20      They do not cite the Bancorp case.  We featured it
21  prominently in our response.  They do not cite it at all.  And
22  Bancorp I think is key here.  In Bancorp the phrase was,
23  understandable, so is the phrase.  In Bancorp the phrase was,
24  "surrender value protected investment credits for the life
25  insurance policy."  The court held that even though there was

85

1  no support in the specification the file history, or the
2  patent for that, the components -- "the components of the
3  disputed term have well-recognized meanings which allow the
4  reader to infer the meaning of the entire phrase with
5  reasonable confidence." They then reversed the grant of
6  summary judgment because the components of the term had
7  well-recognized meanings.
8      The specification here is using -- if you look at
9  the specification using what "desired" means in the ordinary
10  sense here. Two desired orientations. It would be generally
11  desirable to minimize the spacing. Then, of course, we talk
12  about "degree" in the ordinary sense, the ordinary sense, the
13  limited degree of tilting that Mr. Tyler was talking about.
14  Again, when we use "desired degree" it defines the ability --
15  the claim language is clear, Your Honor. It defines the
16  ability of a user to move the display to its elected point.
17  That is why we have to read the entire term in the context of
18  the entire claim.
19      The user selects the position. "The means for
20  adjusting to, thereby, permit said displays to be angled
21  toward each other to a desired degree." Well, of course, the
22  user has to do that. Again, Dell uses the same patent -- the
23  same terms in the ordinary sense. They had hundreds of
24  patents here, but looking at a few of them, any desired --
25  this is from their patent 5,008,976, Claims 14, 15, and 16,

86

1  Any desired viewing angle of the display section, any desired
2  fixed position, a desired computer configuration.
3      And then this is what -- so what is desired? This
4  is what the court said in Datamize. The court specifically
5  noted -- they do not, of course, highlight this in their
6  presentation about Datamize, that Claim 1 is not indefinite
7  for using the term "desired" even though it requires
8  foreknowledge and event intent on the part of the person
9  practicing the invention. That is exactly what we have in
10  this case.
11      And then we have -- the case law gives flexibility
12  in claiming these very things. So they say it is -- "a
13  desired degree" makes it indefinite because we don't know
14  exactly where the user is going to put it. Well, there are a
15  couple of responses to that. The first is the Federal Circuit
16  allows this very flexibility in its claims, so dimensioned as
17  to be insertable. That is Orthokinetics. We don't know
18  exactly what the dimensions are going to be, but the Federal
19  Circuit held that even though there is no exact dimension, if
20  it fits through the automobile door frame it is not
21  indefinite.
22      And in Young the recent case from the Federal
23  Circuit, the claim, said "near the edge of the cat's claw,"
24  insertion. And the court held that that is not indefinite.
25  And then they spent a lot about objective verification of

87

1  these cases. What is a desired degree? Well, I think they
2  would have to concede and I think we are all in agreement here
3  that it means "a desired position." "A," one or more. It is
4  cited in our briefs, the KCJ Corporation case 223 F.3d, 1351;
5  the Abtox case 122 F.3d at 1019 and 1023, that it is one or
6  more.
7      So there is no need to know the entire arc over
8  which the device moves. It is enough to know that it can be
9  objectively verified even before it leaves the factory that it
10  can move to a desired position. Well then they will say,
11  well, we don't know what they desire. Again, let's go back to
12  Datamize. Datamize answers that one. Claim 1 is not
13  indefinite for using the term "desired" even though it
14  requires foreknowledge and intent on the part of the person
15  practicing the invention.
16      And so here we have a term that is clear and
17  understandable on its face. It is turned to a viewing
18  position selected by the -- well, that is our alternative
19  construction, Your Honor, which goes into this, which is we
20  don't think we need any construction for this term. We
21  proposed an alternative construction which is consistent with
22  the usage. It is, "turned to a viewing position selected by
23  the viewer in which the displays are turned toward each
24  other." That is what the claim was talking about. For all of
25  this they say there is nothing in the spec or anything else in

88

1  the file history to support it.
2      I just want to point you to the second bullet point
3  here. This is in the Jerry Moscovitch's reissue declaration.
4  He is specifically talking about this very future. He is
5  clearly making it from the perspective of the user. "Angling
6  the displays toward each other allows glare, which can
7  interfere with the viewing of flat panel displays to be easily
8  eliminated." That quotes ends there, but that has to be from
9  the viewer. The viewer is the one who eliminates glare.
10      And so, again, we have issues of fact about what the
11  ordinary meaning is. We have issues of fact about what a
12  person of ordinary skill would think about this, especially
13  given Dell's patents in this area, and we have the case law
14  that specifically says that "desired" is not indefinite and
15  then allows flexibility. And then, of course, at the very
16  least there should be no more expert discovery on this under
17  Rule 56(f).
18      THE COURT: Anything further?
19      MR. TYLER: Yes, Your Honor. A couple of points on
20  the case Bancorp also the reference to Dell's patents to try
21  to pull out some evidence to raise a genuine issue, that
22  doesn't relate to this patent. Those uses are much different.
23  And just taking the third one they use, the desired computer
24  configuration, if you go to the specification actually it
25  talks about it being viewer selectable, the exact kind of

89

1    thing they are trying to say with their patent but their spec
2    doesn't teach anything like that.
3        I wrote this down when Mr. Nelson said it because he
4    said that Bancorp held that there was no support in the spec
5    for that term.  That is not at all what it said.  In the
6    Bancorp it did review the "surrender value protected
7    investment credits," that claim term, whether it was
8    indefinite.  And what it said is that it is true that entire
9    term is not in the specification; but then it went forward and
10   looked at the specification and talked about how -- it says
11   here that there is correspondence between the reference to the
12   claim term "to surrender value protected in the specified
13   claims" and to reference in the portion of the specification
14   relating to those claims.
15       So what it was doing is looking to the specification
16   for teaching and a view of these terms as being very, very
17   clear.  It says the specification of the patent and the
18   extrinsic evidence make it clear that this protected
19   investment refers to the same claim term.  So what they did is
20   they correlated very similar terminology from the claim term
21   to the specification and got their teaching in that case.
22   That is what Bancorp was all about.  Not to stand for the fact
23   you don't have to have any mention of it or any kind of
24   reference in the specification.  Again, there has to be some
25   verifiable objective standard that comes out of the

90

1    specification.
2        And the plaintiffs have talked about how Mr.
3    Moscovitch in his reissue declaration said this would allow
4    you to eliminate glare because you can move it to a desired
5    degree.  Well, again, if your office requires -- you desire to
6    re-book quite a bit because you have a lot of glare -- I don't
7    know if you have been on an airplane before and you had to
8    move your laptop computer because there is a lot of glare
9    coming out from the window, sometimes windows can put a lot of
10   glare on your computer and you might really want to book it a
11   whole lot; and if this accused device doesn't let me book it
12   that much, it is not getting to a desired degree at that
13   point.  That is our point, Your Honor.
14       Thank you for your time.  I appreciate it.
15       THE COURT:  Let's move on to the 170 patent.  What
16   is the first term?  "Pivotally connected"?
17       MR. TRIBBLE:  One moment, Your Honor.  Mr. Nelson is
18   going to handle this presentation.
19       MR. NELSON:  Your Honor, we have "pivotally
20   connected" and "movably connected" and "rotatably connected."
21   We can probably deal with all of the "connected to" terms at
22   the same time.
23       THE COURT:  All right.
24       MR. TYLER:  And referring to our Slide 4, you see
25   the operative language in Claim 15, 20, and 22.  The Dell

91

1    patent relates to a multi-display system.  It pre-dated Mr.
2    Moscovitch's patent, and it had some narrow claims, it had
3    broad claims.  And a fundamental difference here is that we
4    believe these claims to be quite broad and be the broadest in
5    the patent because of the "connected to" terminology, and Mass
6    is going to argue these should be limited to the
7    specifications.
8        We have left the world of means-plus-function claims
9    and have entered the world of structural claims, and arguably
10   this is how Mr. Moscovitch may have claimed his device if he
11   wanted it to be broader.  The "connected to" terms -- and
12   the crux of the issue here on all of the "connected to" terms
13   is whether Mass can read in supported from, one display is
14   supported from the other and also whether they are directly
15   hinged to each other.
16       Go to Slide 4, -- Slide 5.
17       I have underlined those portions of the construction
18   that Mass is arguing for in this.  It is also important to note
19   that we have three separate constructions for these different
20   types of connections.  There is a pivotal connection, a
21   movable connection and a rotatably connected.  Those are
22   different types of connections arguably we would propose.
23   Mass conflates the construction of pivotally and rotatably to
24   be the same thing.  They are both supported from and directly
25   hinged.  Mass comes up with a different construction for

92

1    "movably connected," directly
2    joined, which I suppose is a little bit broader.  That is
3    really what the focus of this issue is.  Can they get those
4    specific limitations into the connection?
5        Go to the next slide.
6        There is a very simple motive for this.  They are
7    trying to come up with some noninfringement arguments for
8    their device because they are going to argue it is not
9    directly joined or hinged together and one is not supported by
10   the other.  They are going to support through this indirect
11   support arm.  So we know the motivation is, is this proper or
12   not to have that limitation there?
13       Go to Claim 7.
14       Connection -- it is used as unmodified connection.
15   These things are connected together.  They are not
16   means-plus-function terms.  And we believe that should be
17   construed to be either direct or indirect connections.  It
18   should be construed broadly.
19       Go to the next slide.
20       It is important -- in the plaintiff's opposition
21   brief I think it is very important that they spent a lot of
22   time talking about "connected to" and what that means, but
23   they kind of gloss over the fact that there is "pivotal
24   connections," "movable connections" and "rotatable
25   connections."  Those are pretty easily understood words.  The

93

1    "pivotal connection," you think of something pivoting.  It is
2    like the ball joint we were looking at earlier or a joy stick.
3    Something that has a single point that rotates around.  I talk
4    about pivoting.  A basketball player pivots on one foot.
5        "Movably connected," though, is something much more
6    broad.  It allows translation.  It is just some sort of
7    connection, be it indirect or direct.  And we put a dog up
8    here with a leash because that dog and that person are movably
9    connected through that leash.  It doesn't have to be directed.
10       And the "rotatably connected," that is the concept
11   of a hinge.  You have two common points of rotation.  All
12   those claims they have specific meanings and they define these
13   different types of connections.  To just combine them all that
14   it has got to be directly joined or hinged, doesn't give any
15   credence at all to the fact that these modifiers are right in
16   front of "connected."
17       Go to the next slide.
18       Now, the linchpin of Mass's argument this needs to
19   be directly joined or directly attached they say Figure 3
20   of our patent --
21       THE COURT:  That looks like a microwave.
22       MR. TYLER:  That Figure 3 of our patent is what
23   relates to the "connected to" terms.  Effectively they are
24   hinged.  There are several different embodiments in our patent
25   and you can see those.  In Figure 4 and Figure 3, Figure 4 is

94

1    more of an indirect where you would put the flat panel second
2    screen next to it via a hinge, and then the other monitor will
3    sit on top of that and there would be that connection but they
4    are not joined or attached by a hinge.  And what they are
5    saying is that the claim -- all of the "connected to" claims,
6    all of the asserted claims need to be limited to Figure 3 to
7    that hinge embodiment.
8        THE COURT:  Thank you.
9        Let me hear a response.
10       MR. NELSON:  Yes, Your Honor.  I will try to be
11   brief.  Let me start actually by one of Dell's slides.
12       If you could put Dell's slide back up for a second.
13   If you could just go -- I believe it is Slide 5 -- Slide 4,
14   excuse me, of Dell's slide presentation.  Could you put up
15   Slide 4 of your presentation?  It looks like it is -- it says,
16   "Generic Claims 15 and 20 cover all embodiments.  It is listed
17   on Page 4 on the presentation that we have, although --
18       MR. TYLER:  You just had it up.
19       MR. NELSON:  No, it is, "Generic Claims 15 and 20
20   cover all embodiments."
21       (Off-the-record discussion - pause in proceedings.)
22       MR. NELSON:  That one.  If you look at that third
23   bullet point here, Your Honor, under their definition they say
24   Claims 15 and 20 cover all embodiments for all three species.
25   And it is true under their construction it would cover --

95

1    Claims 15 and 20 would cover all embodiments for all three
2    species.  The problem is, however, Your Honor, Dell had to
3    make a species election.
4        Let's put up our slides now.
5        Dell had to make a species election in the file
6    history.  The examiner said you need to pick a claim.
7        And if you go, I believe it is Slide 6.
8        It says -- Dell said before we are looking at this
9    one the PTO told Dell, you have to pick a species that relates
10   to a particular figure.  And Dell responded.  And Dell said
11   that we pick Species I which covers Figures 1 and 2 and these
12   are the claims that specifically relate to Figures 1 and 2;
13   Claims 1, 2, 10, 13, 14, and 17 and all claims dependent on
14   those.  Now the claims differ a little bit.  If you go to the
15   next slide you see the claim number as filed relates to the
16   claim number as issued, Claims 27, 30, 31, 35, and 37.
17       The important point, Your Honor, is that they
18   specifically told the PTO that none of these claims relate to
19   Figures 1 or 2.  And the PTO confirmed it.  This is from the
20   Patent and Trademark Office confirmation Paper 5, Page 2,
21   October 27, 1994.  Claims 5 through 9, 11, 16, 18 through 31
22   and 35 through 39, all of the claims in the suit have been
23   withdrawn from further consideration by the examiner as being
24   drawn to a non-elected Species II and III.
25       But the problem is, Your Honor, under their

96

1    definition it covers Figure 1.  That means that their
2    definition cannot be correct.  It would make the claims in
3    suit read on Figure 1.  Dell does not and cannot deny -- it
4    has been admitted that their constructions encompass
5    Figure 1.
6        THE COURT:  Let me hear Dell's response to that.
7        MR. TYLER:  Yes, Your Honor.  Our construction
8    covers indirect and direct connections.  It covers Species
9    III, which was what is on the front cover of our patent.
10       Go to slide 10, please.
11       Your Honor, have you ever wondered how a figure gets
12   on the front of the patent?  I didn't really know until I
13   started looking at this, but it is actually very interesting
14   and it bears this out quite well.  So the parent patent -- the
15   old grandparent Patent '021 is where Mr. Nelson was talking
16   about the species election.  There you see Species I on the
17   cover of that patent.
18       Then you have the next patent in line, which is the
19   '620.  And on that one you have Figure 3, which they say we
20   are limited to in this case.  Then in our patent you have
21   Figure 4, which is an indirect connection.  And that is what
22   is on the cover of our patent.  So how did that get there?
23   And it is very interesting.  What happens is that --
24       Go to the next slide.
25       The examiner picks the broadest claim of the patent

97

1  and that goes into the Official Gazette.  And then the
2  examiner selects the figure that is consistent with the claim
3  to be printed in the Official Gazette.  And that is the figure
4  that ends up going on the cover of the patent.  Which claim
5  did the examiner pick for the '170 to be the broadest?
6      Go to the next slide.
7      If you look at the file history which we have
8  submitted, what he has identified as the printed claim is
9  Claim 20 with the "movably connected to" term.  He said that
10  is the broadest claim.  Then if you look at what figure he
11  said corresponded with that, it is Figure 4.  That is what
12  appears on the front of our patent.  That is the indirect
13  connection.  So what the examiner is saying is that is the
14  figure that is consistent with Figure 20.  Just to make sure
15  we had it right, we went and pulled up the Official Gazette.
16     Go to the next slide.
17     And sure enough there it was in 1997 the examiner
18  published Claim 20 right next to Figure 4.  So the "movably
19  connected" claim term was corresponded -- was consistent with
20  Figure 4, which was an indirect connection.  To say that
21  somehow there was an election made in the grandparent patent
22  that proved this not to be true is absolutely stretching well
23  beyond what anybody could believe would be normal because what
24  we have here is the exact election which the examiner says the
25  broadest claim is a "movably connected" claim and he

98

1  corresponds it with Figure 4 which is indirect connection.
2      I would like to actually at this time ask that we be
3  allowed to add the Official Gazette to the record for this
4  Markman hearing.
5      MR. NELSON:  No objection, Your Honor.
6      THE COURT:  Admitted.
7      Response?
8      MR. NELSON:  With all respect, I don't think Mr.
9  Tyler answered the question.  In fact, I think he said some
10  things that exactly proved my point why "connected to" can't
11  mean what it says.
12     Could you go back to your slide, Slide 10, please.
13  I believe he started out with that.  Yeah, that one.
14     This is the grandparent patent.  I heard Mr. Tyler
15  say, and I think we are all in agreement here, if you look at
16  the cover, if you zoom in on the cover of the '021 patent,
17  that is Species I, that is Figure 1, Species I.
18     Okay.  Now, what they told the patent -- we are not
19  saying they are necessarily limited to Figure 3.  What we are
20  saying is it can't be Figure 1.  They have told the Patent and
21  Trademark Office it cannot be Figure 1.
22     And so, again, if you go back to our slides, please,
23  and just go back to Slide 8 of our presentation.
24     Again, they have said -- so we know that Species I
25  is Figure 1 and also Figure 2.  Figure 2 is a blowup of Figure

99

1  1.  But they have said that Species I, the "connected to"
2  claims do not read on Species I and Figure 1.  And they have
3  also admitted that their connections, that their claim
4  language reads on Figure 1 under their proposed construction.
5      Now, I have say why they are wrong.  Let me just
6  say briefly why we are right, which is, again, if you go
7  through the file history and the plain language, they don't
8  define the key term.  Under their definitions, Your Honor,
9  they say what does it mean?  They say that it means a
10 connection -- "connected to" in looking at the far column,
11 "connected to" means a connection.  That is just completely
12 circular.  What we say, and this is a little bit different
13 from what is in our brief, but in looking at this during
14 argument I think we are happy with their construction to some
15 degree.  The problem is "connection" needs to be defined.
16     I think what is clear from the file history that we
17 said that we talked about how they elected Species I and then
18 the plain language I will get to in a second, if you just
19 substitute "direct joining" for "connection" that is -- I
20 think we are happy with that construction.  Why is it direct
21 joining?
22     Let's look at the next slide.
23     The plain language, file history, and
24 specification.  Look at what the dictionary says.  This is
25 "connected."  Joined or linked together.  This is used as a

100

1  function word to indicate physical application or attachment.
2  Now, I'm not going to sing for you, Your Honor.  There is an
3  old nursery rhyme that says your leg bone is connected to your
4  knee bone.  They don't say your leg bone is connected to your
5  head bone.  Is Argentina connected to Canada?  Well, only if
6  you go through the entire continent of South America and North
7  America.  It is true that Canada and the United States are
8  connected.  But this is plain language.
9      THE COURT:  Are you changing your proposed
10 construction now to "directly joined"?
11     MR. NELSON:  Your Honor, we will stand by our
12 construction.  I think it is very easy -- yes, Your Honor,
13 with that construction that is up on the screen right now,
14 that is -- we are happy with that construction.  We think that
15 accurately captures the term and the specification.  And,
16 again, that gets to the heart of the dispute here, which is,
17 what is a connection?  They want it to be some indirect,
18 cosmic connection that anything in the world can be united
19 together.  For example, Your Honor, is Mr. Tyler's computer on
20 his stand connected to your computer on your desk?  Well, they
21 would say, yes, because it is connected to the podium, which
22 is connected to the floor, which is connected to your podium,
23 which is connected to the tabletop, which is connected to the
24 desk.  So the connection doesn't tell us anything, and the
25 question is, what is a connection?  If you look at it, it has

101

1  to be --
2          THE COURT:  Excuse me.  Response?
3          MR. TYLER:  Yes, Your Honor.  "Connection" is like
4  you see in Figure 4, an indirect connection or a direct
5  connection.  It is an indirect connection that we have because
6  you are connecting through a couple of pieces of a foreign
7  body there.  There is an interesting flip on this though.
8  They are saying that the Figure 3 embodiment, the hinge, that
9  that is a direct attachment.  Those displays aren't really
10  touching each other really.
11         Can you go to the slide on that.  Slide 15.
12         So in this animation here is Figure 3.  And it
13  has -- you have the two slides next to each other and look
14  they are not connected.  They are connected via a hinge,
15  right?  That is indirect.  Keep going and go on.  And whether
16  that hinge becomes an arm, it is all a third-party body.  It
17  is a foreign body that is connecting.  That is an indirect
18  connection.  Some other assembly is allowing those two to be
19  connected through it.  That is indirect connection, or direct
20  connection can be something that is more directly attached,
21  but it covers both.
22         And the issue about the file history and Mr. Nelson
23  going through that, what he doesn't tell the Court is that our
24  Patent '170 has a terminal disclaimer in it.  And you know why
25  we have a terminal disclaimer, because elected Claim 1 --

102

1  Species I was elected in that grandparent patent.  We have a
2  patent in 170 with claims that cover Species I.  In fact, that
3  was confirmed by the examiner.
4          Go to Slide 14.
5          What the examiner said in the file history is he
6  considered these Claims 15 and 20 to be generic.  And what
7  generic means is they must cover all of the identified
8  species.  That is why we had to have a terminal disclaimer
9  because we had claims in there that covered all of the
10  embodiments.  So they do cover all of the embodiments.  That
11  is why we can't have a term longer than the grandparent
12  patent, and that is why this doesn't require directly joined
13  because directly joined would read out these embodiments like
14  in Figure 4 that there is no -- I think I heard Mr. Nelson say
15  there is no argument that Figure 4 is covered by these claims.
16  That is not direct joining, so they can't be right with that.
17  The connection is specific enough.  And "pivotally" and
18  "rotatably" and "movably connected," we have provided our
19  constructions on those as well.  I appreciate your time.
20         THE COURT:  Final word from plaintiff, and then we
21  will move on.
22         MR. NELSON:  Yes, Your Honor.  I have two brief
23  points.  The one is on the screen now, their slide, the
24  date on that is August 29th, 1994 what they are talking about,
25  their elections from my slides that I showed you before.

103

1  Could you go to that.  Could we go to our slides.
2  That is August 29th.  On ours --
3  Could you go to Slide 6, please.
4  That is after that, September 30th 1994.  And then
5  this is the PTO's response after that, October 27th, 1994.
6          Second point and then that will be it.  They talk
7  about the --
8          Actually, can you go to Slide 31, I believe.
9          They talked about "pivotally connected" and what
10  connected to -- this is from Figure 4.  And when they are
11  describing figure 4 in their specification they say that the
12  pivotal connection is from 42-A to 44-A.  That is the pivotal
13  connection.  They don't say that the plate is connected or
14  anything else.  They talk about 42-A is connected to 44-A
15  right there.  And they say it again.  They say "pivotally
16  connected" again on the second arm down at the bottom.
17  42-A -- or 42-B is connected to 44-B.
18         THE COURT:  Okay.  What is next?
19         MR. TYLER:  Your Honor, next we are going to talk
20  about "secondary" and "primary displays" and whether those are
21  terms of reference.
22         Go to Slide 17.
23         Whether "primary" and "secondary display" means it
24  is a term of reference, "a first display and a multi-display
25  system" and "a second display and a multi-display system,"

104

1  which is our construction, or whether the primary also carries
2  with it the limitation that it is the original principal
3  display supported by the main chassis.  And the secondary --
4  whether that secondary display is not interchangeable with the
5  first display.
6          So what we see here now -- I would agree if this was
7  a means-plus-function claim this might have merit, but it is
8  not.  It is an open-ended term and it is "primary" and
9  "secondary" --
10         Go to Slide 19.
11         Your Honor, our point here is that "primary" and
12  "secondary" are simply terms of reference.  They are commonly
13  understood in the industry when you are talking about
14  displays.  If you look at any operating system back at the
15  time of the patent or now and you are asked to make the device
16  on a multi-display embodiment, it is going to say which one do
17  you want to select as your primary display and which one is
18  your secondary?  And it is just terms of reference referring
19  to common industry term --
20         THE COURT:  Thank you.  Let me hear plaintiff's
21  response.
22         MR. NELSON:  Yes, Your Honor.  Very briefly.  They
23  can't be right on "primary" versus "secondary" because they
24  use first and second different from "primary" and "secondary"
25  in their patents.  For example, if you go to the

105

1  specification, first and second arms, first and second ends,
2  first and seconds edges of displays.  That is what they want
3  to talk about when they say one of two.  When they say
4  "primary" and "secondary," they use it differently.  In fact,
5  the plain language, what does it mean, it is first in order of
6  time -- of first rank importance.
7          And so what you can't have, Your Honor, is something
8  that just substitutes one for the other.  Look again at
9  secondary.  Of second rank or importance or value.  So
10  whenever you have secondary that is contrasting it with
11  primary, which is of second rank importance or value.
12          Let me just say one other alternative definition,
13  Your Honor.  What we are trying to get to in our definition
14  that the Court has is something in all of the claims that Dell
15  uses it is supported by a computer's main chassis.  That is
16  what we were trying to get to.  But the fundamental issue is
17  actually much more simple, which is this is what I think what
18  cuts to the meat of it.  It is consistent with the plain
19  language and it is consistent with the specification.  The
20  "primary display" is the main or fundamental monitor of a
21  computer system.  And the secondary display is a supplemental
22  or subsidiary monitor of a computer system.
23          Now, the specification explains in much more
24  detail -- and it is not just the embodiments, Your Honor, or
25  the preferred embodiments but the summary of the invention and

106

1  the specification itself talks about it; that the display is
2  the "primary display" that is attached to the computer and the
3  chassis.  That is why we put it in there.  But this captures
4  it just as well which is main or fundamental is primary.
5  Supplemental or subsidiary is secondary.  Again, this is
6  completely consistent in line with the plain language, with
7  the specification.
8          Again, look at this.  This is from the abstract.
9  The secondary display is contrasted to what is on the monitor
10  of the computer.  The secondary display is contrasted, which
11  is on the display screen of the monitor.  The secondary
12  display is positioned in close proximity to the computer
13  display.  That is what they are talking about, Your Honor.
14  That is why we think that there this is a difference under
15  Dell's -- what Dell is trying to say is there is absolutely no
16  difference between first and second.  We just don't think that
17  is right.  It is not consistent with plain language.  It is
18  not consistent with the specification.
19          THE COURT:  What is the next term?
20          MR. TYLER:  The next term, Your Honor, is "display
21  controller," and whether the display controllers can be the
22  circuitry or whether they have the preferred embodiment read
23  in of a printed circuit board --
24          MR. NELSON:  Not to interrupt Mr. Tyler.  We have no
25  problem with Dell's definition except for one thing, which is

107

1  they say "first controller."  We just think it should be
2  "primary controller," and it should all depend on what happens
3  with the definition of "primary" and "secondary."
4          MR. TYLER:  So you are okay with "circuitry"?
5          MR. NELSON:  Yeah.  We have no problem with that.  I
6  think that depends entirely on the Court's definition of
7  "primary" and "secondary."
8          THE COURT:  All right.  Very good.
9          What is next?
10          MR. TYLER:  The next term would be the "movement"
11  claim terms we are going to talk about at the same time.  I
12  think this might be the last issue for our patent.  So we are
13  not too long being through here on our patent.  The real
14  question is whether going from first to second means you have
15  to do basically open viewed or the second position would be
16  closed and not in use.
17          Go to the next slide.
18          And that is the key parts of their -- there are a
19  lot of other verbiage in their construction, but really what
20  makes it come out and show they are trying to read some
21  limitations into first and second -- which is ironic.  Just a
22  second ago we were talking about how first and second should
23  have been used if it was going to just be a general reference
24  term.  Now it has some additional meaning.  Again, these
25  aren't means-plus-function terms.  We go from a first to a

108

1  second position.  And that is all that is required.  These are
2  open-ended claims.
3          So to say that somehow the first position has to be
4  open and viewed and the second position has to be closed, is
5  completely inconsistent with the claims themself.  This is an
6  open-ended claim.  It has open structural language.  Just if
7  you look at Claim 16, which is not asserted in this case --
8  and we talk about this on Slide 29.  Claim 16 actually limits
9  the positions.  It says that the first position needs to be
10  substantially parallel -- that means open.  And the second
11  position needs to be substantially orthogonal -- so that would
12  be closed -- or some other orthogonal angle.  But that is
13  where you see the limits put to the first and second
14  positions.  Claim 15, there are no limits, and it is not a
15  means-plus-function term, so there is no reason for them to
16  come in.  That is all we have on that one, Your Honor.
17          THE COURT:  Response?
18          MR. NELSON:  Briefly, Your Honor, a couple points.
19  First they define it in the patent and not in their
20  embodiments.
21          If you could go, please, to Slide 57, please.
22          It is -- the relevant text -- our definition comes
23  from the summary of the invention section, in which they say,
24  "in a departure from the prior art a secondary display system
25  of the present invention includes a flat panel display."  It

109

1  may take any number of different physical forms.  And then it
2  goes on to say, "the second position is retracted to lie flat
3  against the primary display when not in use."  This is from
4  the summary of the invention section.
5      Really, their own argument against that is to say it
6  can't mean that because Claim 15 means one thing and Claim 16
7  is broader.  Actually, that is just not true.  Claim 16 and 15
8  do not mean the same thing.  Claim 16, Your Honor, says that
9  it applies where the secondary display is orthogonal to the
10  primary display.  Just because I got confused on it,
11  orthogonal means perpendicular.  So if it is a box, if it is a
12  regular little cathode ray tube old box that is a perfect
13  perpendicular shape, there would be no difference between 15
14  and 16.  That is not how all displays are.
15      In fact, when the primary display is not completely
16  perpendicular to the primary display or when the primary
17  display is not completely perpendicular there, then you are
18  going to have a difference because, for example, if it is
19  retracted to lie flat, if you have, for example, on your
20  computer screen, if you put it all the way back and lie flat
21  against the back right there, that would not be orthogonal.
22  That would be against.  The same thing at the time in the late
23  1990's and mid-1990's when this was happening, you had tapered
24  cathode ray tubes that would go -- you know, the old
25  Macintosh, for example, or the Mac II or whatever.  They would

110

1  go in.  You would look at it on the front, but then on the
2  back it would taper in.  And if you put that all the way back,
3  then that would be the difference between Claim 15 and Claim
4  16.
5      THE COURT:  Anything further?
6      MR. TYLER:  Yes, Your Honor.  First and second
7  positions -- arguably, this is how Mr. Moscovitch should have
8  claimed his angling to a desired degree.  At least it would
9  have been definite.  I mean, what you have here is going from
10  a first and second position.  If you look at the figures, any
11  of those figures show that these are capable of going to any
12  number of positions, first and second.  Not just going from
13  open to closed.  There is nothing that limits it that way in
14  the specification and certainly nothing in the claims that
15  would suggest that it is limited to an open and closed type of
16  construction.
17      THE COURT:  Okay.  Thank you.
18      Anything further on the '170 Patent?
19      MR. TYLER:  No, Your Honor.
20      THE COURT:  All right.  Who is your mediator?
21      MR. NELSON:  Dick Grainger, Your Honor.
22      THE COURT:  Have y'all had a mediation?
23      MR. NELSON:  We had one in December of 2006, I
24  believe; almost a year ago.
25      THE COURT:  Anybody opposed to going back to

111

1  mediation as soon as you get these other parties added in?
2      MR. TRIBBLE:  We are perfectly happy, Your Honor.
3      THE COURT:  How about defendants?  Anybody want to
4  try this case on principle alone?  I have had several of
5  those, and people usually get hurt.
6      MR. TYLER:  I believe we are happy to mediate
7  again.  I am concerned that until some of these construction
8  issues are resolved, that we might still have a pretty big
9  gap.  But we can sure work at it.
10      THE COURT:  Well, let me instruct y'all to -- both
11  sides to contact Mr. Grainger, and I will instruct -- the
12  defendant is going to be joining the additional defendants and
13  notify them by letter that, you know, there are being joined
14  and that there is going to be a mediation and that it is going
15  to take place sometime in January.  And get with Mr. Grainger
16  and see if you can get a date sometime before the end of
17  January.  And I will order all parties to have people there
18  with executive-level authority to settle the case, and that
19  includes the new defendants that are coming in.  And let's see
20  if y'all can't find a business solution for this.
21      As you can see from the arguments, it is an
22  extremely complex -- what we said looked like it ought to be
23  simple.  There are a myriad of issues that could help or hurt
24  both sides in the case.  I think claim construction is going
25  to be extremely important to both sides, but it can turn out

112

1  bad as well as it can turn out good.  So that creates the
2  wonderful thing called risk upon which good lawyers evaluate
3  their case and cases get settled just like when you are
4  risking it with who knows what a jury will do, who knows what
5  this Judge will do.
6      So we will go to work on this.  We are stacked up.
7  It is going to be a while.  Probably past the end of January
8  before we can get a claim construction out.  So I would
9  encourage y'all to get with Mr. Grainger and get a date, and
10  we would love to receive a phone call from you indicating that
11  the case has been resolved.  If it can't be resolved, we will
12  get you the claim construction opinion as soon as we can work
13  it to the top of our stack.  We will proceed on and we will be
14  on course for -- when is the trial date?
15      MR. TRIBBLE:  November, Your Honor.
16      THE COURT:  November of '08.
17      MR. TRIBBLE:  '08.
18      THE COURT:  So that is 12 months from now.  We
19  should be on track for that.  Anybody see any problem with
20  that trial date if we don't get it settled?
21      MR. TRIBBLE:  Not at all.  In fact, Your Honor, I
22  think that -- I wanted to alert the Court that Microsoft and
23  my client, Sklar, Isabella Fu and I settled that case two days
24  ago.  We are probably going to file something today.  That was
25  set in October of '08.  So that is cleared up off the Court's

113

1    calendar.
2          THE COURT:  Congratulations on getting that
3    resolved.
4          All right.  Anyone else have any settlements with
5    other parties they would like to announce?
6          MR. TYLER:  No, Your Honor.
7          THE COURT:  All right.  We went a long time through
8    lunch.  I know everybody is hungry.  So y'all have lunch
9    together.  Get friendly.  See if you can't get this thing
10   resolved.
11         Thank you.
12
13
14          C E R T I F I C A T I O N
15
16   I certify that the foregoing is a correct transcript from the
17   record of proceedings in the above-entitled matter.
18
19
20   /s/
21   SHEA SLOAN, CSR, RPR
     OFFICIAL COURT REPORTER
22   STATE OF TEXAS NO. 3081
23
24
25

-

=